1    IN THE UNITED STATES DISTRICT COURT
2         MIDDLE DISTRICT OF FLORIDA
              TAMPA DIVISION

3

4   UNITED STATES OF AMERICA,          )
                                       )
5                  Plaintiff,          )
                                       )
6                                      ) Case No.
          vs.                          ) 8:20-CR-00266-MSS-JSS-1
7                                      )
                                       )
8   BERNARDO VARGA,                    )
                                       )
9                  Defendant.          )

10

11

12   _____

                    EVIDENTIARY HEARING
13       BEFORE THE HONORABLE MARY S. SCRIVEN
             UNITED STATES DISTRICT JUDGE

14

                    JULY 27, 2021
15                   1:07 P.M.
                   TAMPA, FLORIDA
16   _____

17

18

19

20

21        Proceedings recorded by mechanical stenography,
       transcript produced using computer-aided transcription.
22   _____

23              DAVID J. COLLIER, RMR, CRR
               FEDERAL OFFICIAL COURT REPORTER
24           801 NORTH FLORIDA AVENUE, 7TH FLOOR
                 TAMPA, FLORIDA  33602

25

**APPEARANCES:**


**FOR THE GOVERNMENT:**


      Emmett Jackson Boggs

      United States Attorney's Office

      400 North Tampa Street, Suite 3200

      Tampa, Florida  33602

      (813) 274-6000



**FOR THE DEFENDANT BERNARDO VARGA:**


      Kathleen M. Sweeney

      Federal Public Defender's Office

      400 North Tampa Street, Suite 2700

      Tampa, Florida  33602-4726

      (813) 228-2715



**INTERPRETER:**    Beatriz Velasquez

              Gabriela Loncar

1                        I N D E X

2                     JULY 27, 2021

3

4   GOVERNMENT'S WITNESSES:

5

6   PETTY OFFICER RAVEN PERRY                            PAGE

7   Direct examination by Mr. Boggs                        10

8   Cross-examination by Ms. Sweeney                       48

9   Redirect examination by Mr. Boggs                      60

10

11  BOARDING OFFICER MARCOS VILLASEÑOR                   PAGE

12  Direct examination by Mr. Boggs                        71

13  Cross-examination by Ms. Sweeney                      105

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      P R O C E E D I N G S

 2                      -  -  -  o0o  -  -  -

 3           COURTROOM DEPUTY:  Please raise your right hand.

 4           Do you solemnly swear or affirm that you will

 5   truthfully and to the best of your ability interpret from

 6   English to Spanish and from Spanish to English all questions

 7   and answers propounded by this Court?

 8                INTERPRETER:  I do, Gabriela Loncar, L-O-N-C-A-R.

 9                INTERPRETER:  I do, Beatrice Velasquez.

10           COURTROOM DEPUTY:  Thank you.

11           THE COURT:  Good afternoon.  Call the case.

12           COURTROOM DEPUTY:  The Court calls Case Number

13   8:20-CR-266-MSS-JSS, United States of America versus Bernardo

14   Varga.

15           Counsel, please state your appearances for the

16   record, beginning with counsel for the Government.

17           MR. BOGGS:  Good afternoon, Your Honor.

18   Jackson Boggs for the United States.

19                THE COURT:  Mr. Boggs, where is your mask?

20           MR. BOGGS:  I'm sorry, Your Honor, I left it at the

21   office.  May I borrow one from the Court, or get one from the

22   Court?  Sorry.

23                THE COURT:  For the defense?

24           MS. SWEENEY:  Good afternoon, Your Honor.

25   Kathleen Sweeney on behalf of Bernardo Varga, who is also
```

1    present with me.

2              THE COURT:  Good afternoon.

3              And the interpreter has been sworn?

4              COURTROOM DEPUTY:  Yes, Your Honor.

5              THE COURT:  Okay.  We will just go forward and she'll

6    just catch up when we are able to get it.

7              We were trying to secure a means by which co-counsel,

8    co-defendant counsel could participate telephonically, and we

9    are having to reboot the phone system, so give us just a couple

10   of minutes.  Maybe they'll get it up and going in a minute.  We

11   stand in loose recess until that time.

12                          - - - - -

13              (Recess at 1:10 p.m. until 1:13 p.m.)

14                          - - - - -

15              THE COURT:  Please state your name for the record.

16              MS. SELLERS:  Amanda Sellers on behalf of

17   Mr. Luna-Gamboa.

18              THE COURT:  All right.  Thank you.

19              All right.  We are here to conduct the suppression

20   hearing in this case, and the Government has never filed a

21   substantive response claiming that the motion is untimely.

22              MR. BOGGS:  Your Honor?

23              THE COURT:  Yes, sir.

24              MR. BOGGS:  My predecessor, Special Assistant

25   United States Attorney Toni Goodin, asked for permission to do

1  so and I believe was denied permission to do so.

2          THE COURT:  Yes, ma'am.

3          MS. SWEENEY:  Your Honor, I'm going to disagree with

4  the record a little bit.  She did file a response that it was

5  untimely.  You allowed me to file a reply, and then what

6  Ms. Goodin asked for was the ability to file another document

7  actually opposing the merits of the motion, if I remember

8  correctly.  In fact, if you look at document 59, this is where

9  they say the matter has been waived and file a brief about that

10 but they did not go much to the merits, and then at document 65

11 you allowed us to file the reply to their opposition about the

12 timeliness.

13         THE COURT:  And there's a point at which the Court

14 barred a substantive response from the Government?

15         MR. BOGGS:  Well, after that --

16         MS. SWEENEY:  I believe so.

17         MR. BOGGS:  I'm sorry.  Yeah.

18         MS. SWEENEY:  Because I think what they asked for was

19 the opportunity to file a brief that went to the merits in more

20 depth than they did in their motion that was based on waiver.

21         Is that correct, Mr. Boggs?

22         MR. BOGGS:  I think that Ms. Goodin styled it as a

23 sur-reply to the second document that the defendant filed.

24 At docket 67 there's a -- well, at docket 66 was, I believe,

25 Ms. Goodin's motion for leave to file the sur-reply, and then

1    at 68 there was an order denying the United States' motion for

2    leave to file a sur-reply.  So Ms. Goodin addressed the merits

3    in her initial response but in very -- in just a paragraph or

4    so, Your Honor.  Yes, that first -- that first response was a

5    motion to deny -- or, excuse me, a response to deny the initial

6    motion as untimely.

7            THE COURT:  Give me one second.

8            Hold on.  I can't pull up my CM/ECF.

9            Do you know if something is wrong with it, Ms. Biron?

10          COURTROOM DEPUTY:  Your Honor, it was out earlier,

11    but it was only supposed to be down for about five to ten

12    minutes.

13          THE COURT:  All right.  Well, I assume the Government

14    is prepared to defend its decision not to Mirandize the

15    defendant until it did, and there are witnesses that are

16    prepared to testify; is that right?

17          MR. BOGGS:  That's correct, Your Honor.

18          THE COURT:  Do the parties wish to make any opening

19    statement in regard to the motion, or do you wish to just move

20    forward to the witnesses?

21          MS. SWEENEY:  Your Honor, I don't need to make an

22    opening statement.  I would like to make a closing.

23          THE COURT:  All right.

24          MR. BOGGS:  That's fine, Your Honor.

25          THE COURT:  Call your first witness.

1              MR. BOGGS:  Would you like for the Government to go

2    first, Your Honor?

3              THE COURT:  Yes.

4              MR. BOGGS:  Your Honor, the United States calls

5    Officer Raven Perry.

6              THE COURT:  Is the Rule being invoked?

7              MS. SWEENEY:  Yes, Your Honor.

8              THE COURT:  Ma'am, you'll need to have a mask on if

9    you're in the courtroom.

10             MS. OHLEY:  Yes, Your Honor.

11             THE COURT:  Is that Ms. Ohley?

12             COURTROOM DEPUTY:  Please raise your right hand.

13             Do you solemnly swear or affirm, under penalty of

14   perjury, that the statements you give in these proceedings will

15   be the truth, the whole truth and nothing but the truth?

16             THE WITNESS:  I do.

17             COURTROOM DEPUTY:  Please state your name for the

18   record.

19             THE WITNESS:  My name is Raven Perry, and that is

20   R-A-V-E-N, last name P-E-R-R-Y.

21             THE COURT:  Thank you, Ms. Terry.  If you'll have a

22   seat in the witness box.

23             Ms. Terry, you're under oath.  You have to give

24   truthful answers.  If you give false answers, you face

25   penalties of perjury, false statement and obstruction.  Do you

1 | understand that?

2 |        THE DEFENDANT:  Yes, ma'am.

3 |        THE COURT:  At the same time, the Court is not trying

4 | to trick you, so if you don't understand a question, make sure

5 | you understand the question before you answer it, and do not

6 | talk over counsel, even if you can anticipate what he's going

7 | to ask you.  Do you understand that?

8 |        THE WITNESS:  Yes, ma'am.

9 |        MR. BOGGS:  And, Your Honor --

10 |        THE COURT:  One second.  One second.

11 |        MR. BOGGS:  Okay.

12 |        THE COURT:  Does the defense intend to invoke the

13 | Rule with respect to the witnesses?

14 |        MS. SWEENEY:  Yes, Your Honor.

15 |        THE COURT:  And do you have any witnesses in the

16 | courtroom, Counsel, that are intending to testify?

17 |        MR. BOGGS:  No, Your Honor.

18 |        THE COURT:  All right.  Yes, sir.  You may proceed.

19 |        MR. BOGGS:  I was going to say, Your Honor, it's very

20 | difficult with the masks, but it's Officer Perry, with a P.

21 |        THE COURT:  Oh, Officer Perry.

22 |        MR. BOGGS:  Yes.

23 |        THE COURT:  Thank you.

24 |        MR. BOGGS:  You're welcome.

25 |

**DIRECT EXAMINATION OF PETTY OFFICER RAVEN PERRY**

**BY MR. BOGGS:**

Q    Officer Perry, could you describe -- well, first of all, what's your position?

A    I am a Petty Officer Second Class in the United States Coast Guard.

Q    How long have you been a petty officer with the Coast Guard?

A    I've been in the Coast Guard for almost eight years now, and I have been a maritime law enforcement officer for six and a boarding officer for six years.

Q    Okay.  Could you describe for the Court what training you have for that position, maritime law enforcement officer and boarding officer.

A    Yes.  I initially went to school in order to become a maritime law enforcement officer, and throughout my career we do three to six month evaluations to make sure that we are up-to-date with current information and to make sure that we are proficient in our boardings.

Q    You mentioned you've been both a boarding officer and a maritime law enforcement officer for a number of years.  Does that involve being out on cutters in the Eastern Pacific Ocean?

A    Yes, sir.

Q    How often are you out on the high seas?

A    I would say on an average anywhere from six to

1  eight months a year.

2  Q    Where are you currently stationed?

3  A    I'm currently stationed in San Diego, California.

4  Q    So you came here from San Diego for this hearing?

5  A    Yes, sir.

6  Q    You gave an overview of your training.  Could I dig a

7  little deeper on issues that you learn about with respect to

8  boarding.  What are the -- what's the focus of your training in

9  the order of boarding?

10 A    The focus of our training is making sure that we are

11 conducting all of our evolutions in a safe, effective manner,

12 making sure that we're upholding policy and just making sure

13 everything is done correctly in the progression that it is

14 supposed to.

15 Q    Are you given any training in the area of the law relating

16 to boarding?

17 A    Yes, we are.  We go through a six month qualification

18 board in order to obtain our boarding officer qualification.

19 Q    What is -- if you can describe it, you know, fairly

20 simply, what is the boarding authority of the Coast Guard when

21 it's out in international waters?

22 A    So the Coast Guard may make inspections, searches,

23 seizures and arrests upon the high seas in waters over which

24 the United States is subject -- or over which is subject to the

25 United States.  Commissioned warrant petty officers may at any

1   time go aboard any vessel subject to U.S. jurisdiction, they

2   may make inquiries to those on board, examine the vessel's

3   documentation and paperwork and conduct inspections and

4   searches aboard those vessels and use all necessary force to

5   compel compliance.

6   Q    Do you have to go through a chain of command, an

7   authorization process to board a vessel that you find out in

8   international water?

9   A    Yes, sir.

10  Q    Without describing the chain, you know, each link in the

11  chain of command, what's involved in getting permission to

12  board a particular vessel?

13  A    Can you ask that a little bit more clearly?

14  Q    Yes.  Sorry.

15        First of all, what are the types of events that might

16  initiate a boarding?

17  A    So some things that might initiate a boarding are seeing a

18  target of interest vessel, and then we have certain types of

19  boarding scenarios that we do, which I can go through if you'd

20  like me to.

21  Q    For example, you mentioned you see a target of interest.

22  Do you have other assets besides Coast Guard cutters that are

23  scanning the high seas?

24  A    Yes.  So besides Coast Guard cutters we have allied

25  nations as well as military aircraft or duly authorized

1   aircraft that work in conjunction with us.

2   Q    Okay.  And do you do safety and document inspections of

3   vessels once you've received authorization to board them?

4   A    Yes, sir.

5   Q    Okay.  Before I dig into the nitty gritty of this

6   particular case, what's -- what's a law enforcement boarding, a

7   full law enforcement boarding?

8   A    So full law enforcement boarding entails going through the

9   vessel more methodically, searching for any type of evidence

10  using ion scans, which we swab the vessel with to pick up any

11  trace particles of any type of narcotics, and we are also

12  accounting for all space on that vessel to make sure that there

13  aren't any hidden compartments or areas that we have missed.

14  Q    I probably should have asked you this first.  What's a

15  right of visit boarding?

16  A    So a right of visit boarding is -- under international

17  law, it's the right of any warship or duly authorized vessel or

18  military aircraft in international waters to board a vessel of

19  unknown nationality in order to determine its nationality.

20  Q    And would that be, generally, the first type of boarding

21  you would do?

22  A    Yes, sir.

23  Q    And are both the right of visit boarding that you just

24  described and the law enforcement boarding that I asked you

25  about earlier, are both types of boardings boardings that you

1    would need authorization in order to conduct?

2    A    Yes, sir.

3    Q    Okay.  And that's from the chain of command?

4    A    Yes, sir.

5    Q    Okay.  In the Eastern Pacific, where you've been

6    operating, is Spanish important?

7    A    Yes, it is very important.

8    Q    Do you speak Spanish?

9    A    No, sir.

10   Q    Is there usually a Spanish speaker, if possible, amongst

11   boarding teams?

12   A    Yes, sir.

13   Q    And when a right of visit boarding takes place, are there

14   standard questions that are asked of persons on board a vessel?

15   A    Yes, sir.

16   Q    Are they always the same questions?

17   A    Yes, sir.

18   Q    Is there a list of questions?

19   A    Yes, sir.  We have lists, 1 through 28.

20   Q    Let me turn your attention then to the circumstances of

21   this particular case.  Were you on duty last year, in September

22   of last year?

23   A    Yes, sir.

24   Q    Were you out in the Eastern Pacific Ocean on board one of

25   those -- I believe you called them partner nations or allied

1  nations vessels?

2  A    Yes, sir.

3  Q    Could you describe that a little bit.  How does that

4  work --

5  A    Yes, sir.

6  Q    -- that the Coast Guard would be on an allied nation

7  vessel?

8  A    So we work in conjunction with certain nations in order to

9  uphold international law, and the ARGAS is one of -- or

10 I should say is a nation that we work with on these issues, and

11 so we are allowed to be ship-riders aboard their vessel in

12 order to assert our authority over certain boardings and cases.

13 Q    So last year in September you were on an allied nation

14 vessel as part of a Coast Guard team?

15 A    Yes, sir.

16 Q    During that time did you become involved in the case that

17 eventually became the case of United States versus Bernardo

18 Varga?

19 A    Yes, sir.

20 Q    Could you describe how you became involved in that case.

21 A    Yes, sir.

22        So I was the boarding officer for this evolution, and

23 what that entails is myself and my team go out to determine the

24 nationality of a target of interest, and then the series of

25 events that followed were because of those initial actions.

1   Q    What preceded your involvement?  What initiated your
2   involvement?
3   A    My chain of command delegated it down that we would be
4   conducting these operations.
5   Q    Did someone else notice what you called the target of
6   interest or was it something that you and your boarding team
7   did yourselves from the British ship?
8   A    It was an aircraft that found the target of interest.
9   Q    So then did you launch from the British ship once you had
10  authorization to go investigate?
11  A    Yes, sir.
12  Q    And what kind of vessel did you launch in?
13  A    We launched in a RHIB, which stands for a rigid inflatable
14  hulled boat.
15  Q    Are those sometimes called small boats?
16  A    Yes, they're referred to as small boats as well.
17  Q    Who was on that Rigid Hulled Inflatable Boat?
18  A    It was myself as the boarding officer; Petty Officer
19  Villaseñor as my translator and my assistant boarding officer;
20  we had Petty Officer Barber, who was our boarding team member;
21  we had two members of the ARGAS who were the small boat's crew,
22  the cockswain and a crew member, which was Thornton and Fidal.
23  I'm sorry, I always ruin his name.
24  Q    They were driving the boat?
25  A    Yes, sir.

1  Q     Were you the leader or person in charge of that crew?

2  A     Yes, sir.

3  Q     What happened?

4  A     Do you want me to start from the beginning?

5  Q     Well, yeah, let me direct you a little bit so it just

6  doesn't go on and on.

7        So you mentioned that you embarked from the ARGAS, a

8  British ship, on this smaller boat with the crew that you just

9  mentioned and you were headed towards a target?

10       MS. SWEENEY:  Objection, Your Honor, to narrative

11  testifying.

12       THE COURT:  Is there a question in there somewhere?

13       MR. BOGGS:  Yes.  I'm getting to it.  It's just

14  trying to set the -- set the --

15       THE COURT:  You don't need to set the stage, you can

16  just ask a question.

17       MR. BOGGS:  Okay.

18  BY MR. BOGGS:

19  Q     Once you embarked on the smaller boat, what happened?

20  A     Once we embarked on the small boat, we began transiting

21  towards the position of the TOI.  Our first vessel that we

22  launched with --

23  Q     TOI is target of interest?

24  A     Yes.  Yes, sir.

25  Q     Um-hum.

1    THE COURT:  Can you tell me what time it was when you
2    launched the small boat?
3    THE WITNESS:  I do not recall offhand, but if I could
4    look at my statement I would be able to know the exact time.
5    THE COURT:  What was the approximate time?
6    THE WITNESS:  I'm not sure exactly what the
7    approximate time was, but it is written in my statement.
8    THE COURT:  How long did you travel on the small boat
9    before it became disabled?
10   THE WITNESS:  I would say approximately about
11   45 minutes.
12   MR. BOGGS:  After -- may I continue, Your Honor?  And
13   I'd be happy to refresh the witness's recollection with her
14   statement as well.
15   THE COURT:  Well, I just want to know her testimony
16   on her best memory, because I want to gauge her ability to
17   remember the things she claims to remember and those she
18   doesn't claim to remember, and then if you want to follow up
19   with refreshing, you can do that.  She doesn't remember what
20   time it was within an hour or two when she disembarked on the
21   smaller boat, but she remembers they were on it for about
22   45 minutes before it became disabled, and then what happened?
23   THE WITNESS:  When the vessel became disabled, we
24   relayed back to the ARGAS that the vessel's engines had failed.
25   At that time the ARGAS was preparing a secondary boat for us to

1  swap onto so we could continue the pursuit.

2          THE COURT:  And how did you get that boat?

3          THE WITNESS:  A secondary crew lowered it into the

4  water and then we came alongside and completely swapped our

5  crew with the other crew.

6          THE COURT:  But did they come to you or did you

7  paddle over to them?  How did you get --

8          THE WITNESS:  They came to us.

9          THE COURT:  And how long did that take?  That was

10  within that same 45 minutes?

11          THE WITNESS:  No, ma'am.  Once we relayed that the

12  engines had casualty, I would say it took an additional 30 to

13  45 minutes in order to get that secondary vessel to us.

14          THE COURT:  And so now you're in the water an hour

15  and a half?

16          THE WITNESS:  Yes, ma'am.

17          THE COURT:  And then what happened?

18          THE WITNESS:  Once we got onto the secondary vessel

19  we continued pursuit on the coordinates that were given to us.

20          THE COURT:  By the plane?

21          THE WITNESS:  By my -- the person that is in charge

22  of me by my chain of command.

23          THE COURT:  And chain of command got it from where?

24          THE WITNESS:  From the plane.

25          THE COURT:  All right.  Go ahead.

1  BY MR. BOGGS:

2  Q    Could I ask you, was it still daytime, was it still light

3  out when all this was happening, when the boat switch happened,

4  for example?

5  A    Yes, sir.

6          THE COURT:  Well, let me ask you a technical

7  question.  What time is 2259 Z in Eastern Time?

8          Well, not in Eastern Time.  In actual time where you

9  were, what time is 2259 Z?

10         THE WITNESS:  I don't have the exact conversion in my

11 head right now of the time difference between Zulu and Eastern,

12 but it was in the afternoon when we were underway doing this

13 boarding.

14         THE COURT:  But what is the actual time of day in

15 Zulu of 2259?

16         THE WITNESS:  I'm not sure of the conversion for Zulu

17 offhand.

18         THE COURT:  So you don't know whether it was

19 nine o'clock or ten o'clock or four o'clock or six o'clock in

20 the morning?

21         THE WITNESS:  I can tell you it was between 4:00 to

22 5:00 p.m.

23         THE COURT:  4:00 to 5:00 p.m. where you were, not

24 Eastern Time?

25         THE WITNESS:  We were in -- I'm not sure if we were

 1  between Eastern -- yeah, I don't recall.

 2          MR. BOGGS:  May I?

 3          THE COURT:  You may.

 4  BY MR. BOGGS:

 5  Q    You were in the Pacific Ocean --

 6  A    Right.

 7  Q    -- correct?

 8          And it was -- it was light out when the boat swap

 9  occurred?

10  A    Yes, sir.

11  Q    What did you do after -- after --

12          THE COURT:  Well, I thought you were going to clear

13  up my question.  I need to know what time it was, and I still

14  don't know what time it was.

15          THE WITNESS:  Yes, ma'am.  There is a conversion

16  number for the Zulu time.  I don't know it offhand.  It was

17  between -- for us it was between 4:00 and 5:00 in the

18  afternoon.

19          MR. BOGGS:  I'm sorry, Your Honor.  One of the

20  reasons why I can't clear it up is because I assumed that that

21  was just military time.

22          THE COURT:  Well, that's what I was asking, and the

23  answer is no, it's not, and this witness doesn't know what time

24  it was.

25          THE WITNESS:  So Zulu time goes off of a headquarters

1   time in a different location from where we are, which is why it

2   can vary depending on where anybody is in the world.  Everybody

3   uses the standard Zulu time, so it's not the –- it's not the

4   same for everybody.  I would need to know the conversion rate

5   for that.

6               THE COURT:  But in your mind, it was between 4:00 and

7   5:00 p.m. when you launched the first boat that failed, or when

8   you were on your second boat?

9               THE WITNESS:  I would say by the time we were on our

10  second boat, it was probably between 5:00 to 6:00.

11              THE COURT:  All right.  Counsel, you may continue.

12              MR. BOGGS:  Thank you, Your Honor.

13  BY MR. BOGGS:

14  Q    You mentioned earlier that you then proceeded towards the

15  target of interest again.  What happened at that point?

16  A    As we approached the target of interest we had a very

17  heavy rainstorm that came through that really reduced

18  visibility, so we were driving to the TOI, they had stopped in

19  the water, I assume because of the rain, and once they had

20  noticed our approach they began jettisoning packages overboard

21  and began to get back underway and try to evade our approach.

22  Q    Did you follow?  Did you stop in that area?

23  A    We stopped to recover one of the packages and then

24  continued our pursuit.

25  Q    Did you leave anything in the water to be able to come

1  back to the jettison field?

2  A    Yes, we left a transmitter beacon that we left with the

3  jettison field.

4  Q    Did you eventually catch up with the target of interest?

5  A    Yes, sir.

6  Q    About how long did it take to catch up with the target of

7  interest?

8  A    I would say between 30 to 45 minutes.

9  Q    And when you did, was it -- was it stopped, was it still

10  running away?  What was it doing?

11  A    So as we were approaching the target of interest, the

12  C-130 came down and came across the bow of the vessel in order

13  to show a greater officer presence, and at that time, once they

14  saw that the plane was in the air as well, they -- they came

15  down on their speed and we were able to come alongside them.

16  Q    Did you remain on the small boat?

17  A    Yes, sir.

18  Q    Who, if anyone, boarded the target of interest?

19  A    Petty Officer Villaseñor and Petty Officer Barber crossed

20  then onto the TOI.

21  Q    In the interim -- I should have asked this first -- did

22  you receive authorization to do so?  Authorization for the

23  boarding.

24  A    Oh.  Yes, sir.

25  Q    The right of visit boarding.

1   A      Yes, sir.

2            THE COURT:  Well, "yes, sir."  "Yes, sir."

3            When you arrived, after the C-130 slowed the plane

4   down -- I mean, the C-130 plane caused the TOI to slow down and

5   take notice that law enforcement was in the area, what happened

6   next?

7            THE WITNESS:  Once that happened, the vessel came to

8   be DIW, dead in the water.  We came alongside.  Because of how

9   big both the vessels were, we were unable to achieve positive

10  control.

11           THE COURT:  Both of the vessels, yours and the TOI?

12           THE WITNESS:  Yes, ma'am.

13           THE COURT:  Um-hum.

14           THE WITNESS:  We were unable to achieve positive

15  control, so I sent my two team members over in order to pull

16  the kill switch for the vessel so it can no longer get

17  underway, and to make sure that there was no scuttling, for

18  both the safety of my team and the three POB that were on the

19  target of interest.

20           THE COURT:  Oh.  Try not to use acronyms so that all

21  of us can follow you, but when you sent your people over, what

22  does that mean?

23           THE WITNESS:  So I sent them over in order to make

24  sure that we had positive control over the vessel.

25           THE COURT:  You sent them over.  You told them to

1    swim over?  They jumped over?

2           THE WITNESS:  They jumped over.  We butted the boats

3    up right next to each other and they were able to cross over

4    onto the --

5           THE COURT:  They jumped off your boat into the target

6    boat?

7           THE WITNESS:  Yes, ma'am.

8           THE COURT:  Before or after you got word from chain

9    of command to kill -- to do the kill switch part?

10          THE WITNESS:  We -- we had authorization.

11          THE COURT:  So you get alongside the boat and you're

12   sitting there and their boat is still operable, and then what

13   do you -- do you call back for authority to board?

14          THE WITNESS:  No, ma'am.  So at first we made sure

15   that the vessel was dead in the water so that we had -- we have

16   to achieve positive control of the vessel in order to begin our

17   boarding questions.  We were unable to do so until I sent two

18   people over in order to turn the vessel off and to make sure

19   that the people on the vessel were unable to flee.

20          THE COURT:  And that's my question.  What happened

21   between the time you realized you didn't have positive control

22   and the time that you sent your people over onto the vessel?

23   What did you do, what did anyone do?

24          THE WITNESS:  So I was on the bow of the vessel.

25   I was covering down on the individuals that were on the target

1   of interest, making sure that we had control of the situation.

2           THE COURT:  "Covering down" means you drew your

3   weapon?

4           THE WITNESS:  Yes, ma'am.

5           THE COURT:  Okay.

6           THE WITNESS:  And then as I was covering down, I sent

7   my two crew members over to make sure that the vessel was dead

8   in the water and that we did achieve positive control, and that

9   is what happened.

10          THE COURT:  And when did you call back to chain of

11  command for permission to board?

12          THE WITNESS:  We did not conduct a boarding at that

13  time.

14          THE COURT:  So when you go over onto the target

15  vessel to kill it, basically, no one had given any authority to

16  do that other than yourself to the people in your chain of

17  command, your below chain of command?

18          THE WITNESS:  Yes, ma'am, for --

19          THE COURT:  You made that call?

20          THE WITNESS:  For officer safety, yes, ma'am.

21          THE COURT:  And no one gave you permission to get on

22  the vessel other than your knowledge of whatever was necessary

23  to secure the vessel?

24          THE WITNESS:  Yes, ma'am.

25          THE COURT:  Okay.  And then what happened?

1     MR. BOGGS:  May I?

2     THE COURT:  You may?

3   BY MR. BOGGS:

4   Q    I think I set up a confusion by skipping -- by not

5   sequencing my questions properly, so let me return to the right

6   of visit authorization.  Did that not happen long before

7   this --

8     THE COURT:  That's a leading question.  You can ask

9   her when it happened.  She just told us.

10  Q    When did the right of visit boarding authorization happen?

11  A    It happened as soon as we came alongside.  I have a radio

12  on me at all times that I can hear my Deployable Team Leader

13  through, and as we are coming alongside, he is relaying

14  information to me for the boarding team.

15  Q    So you received authorization --

16    THE COURT:  Counsel, you cannot ask her a leading

17  question.  She already answered the question, and she can't

18  change her answer in the middle unless she's going to tell me

19  she wasn't telling the truth before.

20    MR. BOGGS:  I'm not asking that, Your Honor.  I'm

21  just trying to make it quite clear, that's all.

22    THE COURT:  Well, the question I asked her is:  What

23  happened between the time you realized you did not have

24  positive control and the time you sent your people over to the

25  vessel?  What did you do, what did anyone do?

1          So I was on the vessel, I was covering down on the

2    individuals on the target of interest, making sure we had

3    control of the situation.

4          And I said "covering down" means you draw your

5    weapon?

6          And she said, yes, ma'am.

7          And then you said -- then she said, and then I was

8    covering down, I sent my two crew members over to make sure the

9    vessel was dead in the water and that we did achieve positive

10    control, and that is what happened.

11          And did you call back chain of command for permission

12    to board?

13          We did not conduct boarding at that time.

14          So when you went over to the target vessel to kill

15    it, basically, no one had given any authority to do that other

16    than yourself, the people in your chain of command below you?

17          Yes, ma'am.

18          You made that call?

19          For officer safety, yes, ma'am.

20          And no one gave you permission to get on the vessel

21    other than your knowledge of whatever was necessary to secure

22    the vessel?

23          Yes, ma'am.

24          Okay.  And then what happened?

25          So I get the impression from this that you saw a

 1  danger and a need to secure the vessel, you told your people to

 2  go kill the vessel, they killed the vessel.  Now, are they on

 3  the vessel or do they come back over to your vessel?

 4          THE WITNESS:  They were on the vessel to pull the

 5  kill cord.

 6          THE COURT:  And then what happened?

 7          THE WITNESS:  And then after that happened we -- I

 8  was talking with the DTL about --

 9          THE COURT:  "DTL" means?

10          THE WITNESS:  The Deployable Team Leader, about

11  starting to get the questions together to run it up the chain

12  of command.

13          THE COURT:  And the DTL is on the vessel or on your

14  vessel or on your walkie-talkie?

15          THE WITNESS:  He's on the walkie-talkie.  He is back

16  on the ARGAS.

17          THE COURT:  And then what happened?

18          THE WITNESS:  We asked the questions from our form.

19  I had my translator ask the questions, since I do not speak

20  Spanish.

21          THE COURT:  When did you get authority to board the

22  vessel beyond your authority to kill the vessel?

23          THE WITNESS:  I'm not sure what time precisely it

24  was.

25          THE COURT:  When in the sequence of things?

 1          THE WITNESS:  I will need to refer to my statement.
 2     I'm not sure exactly what time it was.
 3          THE COURT:  But when in the sequence of things, not
 4     what time it was in the day.
 5          THE WITNESS:  For the boarding it would be once we
 6     are given authorization by the country.
 7          THE COURT:  Before or after you killed the switch did
 8     you get permission to board the vessel?
 9          THE WITNESS:  That would be after.
10          THE COURT:  So you get permission to board the vessel
11     and then what happens?
12          THE WITNESS:  So once we -- are we going into the
13     law enforcement boarding section of this?
14          THE COURT:  I don't know what happened.  I wasn't
15     there.  After you got permission to board the vessel, which
16     your people were already on, what did you do?
17          THE WITNESS:  Once we got permission to board the
18     vessel, we began going through and doing our ion scan swabs,
19     which are --
20          MR. BOGGS:  Your Honor?
21          THE COURT:  Yes, sir.
22          MR. BOGGS:  I'm sorry, but I think that the witness
23     is confused, and if I could resume questioning.
24          THE COURT:  You may.
25          THE WITNESS:  Thank you.

1            THE COURT:  But not leading questions though.

2            MR. BOGGS:  I understand.

3    BY MR. BOGGS:

4    Q    I want to draw a very clear distinction.

5            THE COURT:  I don't want you to draw any

6    distinctions.  You get to ask questions, you don't get to draw

7    distinctions.  You can ask a question, Counsel, and you know

8    how to do that.

9    Q    Earlier when I asked you about --

10           THE COURT:  Counsel, just ask your question.  You

11   can't go back to old testimony.

12   Q    All right.  I'm asking you about right of visit boarding

13   only.

14   A    Yes, sir.

15   Q    When precisely did you receive authorization for the right

16   of visit boarding, not the law enforcement boarding?

17   A    That was when we came alongside the vessel.

18   Q    Was it within minutes of coming alongside the vessel?

19   A    Yes, sir.

20   Q    Was it after coming alongside the vessel?

21   A    It was --

22           MS. SWEENEY:  Objection.  Asked and answered and

23   leading.

24           THE COURT:  I don't understand the question because

25   it's two questions and she didn't give you the answer you

1  wanted so you asked her a different one.

2          MR. BOGGS:  No.  No.  Your Honor, all I want is the

3  truth.  I don't want a particular answer.  I only want the

4  truth.

5          THE COURT:  Okay.  Let's ask her the question then.

6  BY MR. BOGGS:

7  Q    Was the right of visit boarding authorization before or

8  after you came alongside the vessel?

9  A    It was beforehand.

10 Q    How long beforehand did you get your right of visit

11 boarding authorization before you came alongside the target of

12 interest?

13 A    I'm not sure the approximate time, because I do have the

14 radio that --

15 Q    The ballpark figure of the time between getting right of

16 visit --

17 A    I would say within minutes.

18 Q    Okay.

19          THE COURT:  Well, I don't know the question because

20 you interrupted him.

21          THE WITNESS:  Oh, I'm sorry.

22          THE COURT:  Ballpark figure of the time between

23 getting right of visit --

24 Q    Boarding authorization and coming alongside the target

25 vessel.

1              And the answer is?

2    A    Within minutes.

3    Q    You were asked some questions about boarding authorization

4    before.  Were you mixing in law enforcement boarding

5    authorization?

6    A    Yes.

7              MS. SWEENEY:  Objection, Your Honor.  Leading.

8              THE COURT:  Overruled.  I'll let you Cross her.

9    A    Yes, I was mixing -- because there was two separate

10   boardings technically, the right of visit and then a

11   law enforcement boarding, which are two separate events.

12   Q    Okay.  You mentioned in response to the Court's questions

13   that you had drawn your weapon.  When did you draw your weapon?

14   A    I drew my weapon as we were coming alongside the vessel.

15   Q    What type of weapon was it?

16   A    It's a personal defense weapon.  It is a pistol.

17   Q    Were there other crew members, your crew members that also

18   drew their weapons?

19   A    Yes, sir.  The zero three Coast Guard members all drew

20   their weapons.

21             THE COURT:  How many were there?

22             THE WITNESS:  Of the Coast Guard members?

23             THE COURT:  How many total people had drawn their

24   weapons?

25             THE WITNESS:  Three.

1          THE COURT:  Yourself included?

2          THE WITNESS:  Yes, ma'am.

3   BY MR. BOGGS:

4   Q    And the two British crew members, did they draw their

5   weapons?  Did they have weapons?  Did they draw weapons?

6   A    Then had weapons.  They did not draw their weapons.

7   Q    How long did the weapons remain drawn?

8   A    I would say approximately between five to ten minutes.

9   Q    You mentioned earlier that two members of your crew

10  boarded the boat to make sure that the kill switch was

11  initiated.  Did they have their weapons drawn after boarding

12  the vessel?

13  A    No, they did not.

14  Q    Did anyone have their weapons drawn while aboard the

15  target vessel?

16  A    No.  The only person that had their pistol drawn was me,

17  and I was on our own vessel covering down to make sure that

18  they safely got over.

19  Q    Are you familiar with the term --

20          THE COURT:  So I'm a little bit confused.  So they

21  were jumping over a moving buoying vessel trying to get over to

22  the other vessel?

23          THE WITNESS:  The vessel was dead in the water, it

24  was not moving.

25          THE COURT:  But it was moving because of the water.

1    It wasn't moving through the water.

2              THE WITNESS:  Yes, ma'am.

3              THE COURT:  I'm assuming it wasn't stable, like on

4    land.

5              THE WITNESS:  Yes, ma'am.

6              THE COURT:  And so these guys were jumping over your

7    vessel onto the target vessel, and your job was to provide

8    cover for them because they couldn't, obviously, have their

9    weapons drawn when they were bobbing about the ocean.

10             THE WITNESS:  Yes, ma'am.

11             THE COURT:  And did you keep your weapon drawn until

12   they killed the vessel?

13             THE WITNESS:  Yes, ma'am.

14             THE COURT:  Did the plane have a weapon?

15             THE WITNESS:  I'm unaware of that.

16             THE COURT:  So you never saw the plane covering

17   during this period?

18             THE WITNESS:  No, they were -- they were very high

19   above us.

20             THE COURT:  All right.  Counsel.

21   BY MR. BOGGS:

22   Q    Are you familiar with the term "surface use of force"?

23   A    Yes, sir.

24   Q    What is that?

25   A    Surface use of force is when you are authorized on our

1   vessel to stop a vessel that is evading detection by means of

2   warning shots and disabling fire.

3   Q    What type of weapons do Coast Guard small boats generally

4   have?

5   A    They have mounted -- they can mount 50 cals.  They can use

6   a Mark 18.  You can do shotgun.  There's multiple forms.

7   Q    Did the small boat in this case, which belonged to --

8   which came from the ARGAS, allied nation ship, have any of

9   those types of weapons?

10  A    No, sir.

11  Q    Was the only weapon on the small boat with you and your

12  crew your sidearms?

13  A    Yes, sir.

14  Q    When, if ever, did you put your pistol away, holster your

15  pistol?

16  A    Once we obtained positive control and the crew was

17  mustered, I put my pistol away.

18  Q    And "mustered," what does that mean exactly?

19  A    We ensured that the three persons that were aboard the

20  vessel were in the front, on the bow, to give separation

21  between my officers and themselves.

22  Q    Could you observe from your position on the small boat

23  what was going on on the target of interest vessel?

24  A    Yes, sir.

25  Q    At the time of this right of visit boarding, was it still

1   light out?

2   A    Yes, sir.

3   Q    Could you hear whether or not your assistant boarding

4   officer was questioning people on the boat?

5   A    Yes, sir.

6   Q    The target of interest boat.

7   A    Yes, sir.

8   Q    Was it in Spanish or English?

9   A    It was in Spanish.

10  Q    Did you understand the responses?

11  A    I do not speak Spanish.  No.

12          THE COURT:  I'm sorry.  When you say you could hear

13  that the person was questioning, could you hear what the

14  questions were?

15          THE WITNESS:  I could hear him asking in Spanish.

16  I'm not -- I don't speak Spanish, so --

17          THE COURT:  If you were called upon to repeat exactly

18  the words that he said at the time, could you hear well enough

19  to just repeat what the words were?

20          THE WITNESS:  He was speaking Spanish, ma'am.

21          THE COURT:  I understand that, but if I say

22  "buenos dias," you can hear me say that.  Could you have said

23  at the time "buenos dias"?

24          THE WITNESS:  I could hear him clearly, yes.

25          THE COURT:  Enough to hear the words he was saying,

1  not just that he was shouting questions at them?

2          THE WITNESS:  Yes, ma'am.

3          THE COURT:  All right.  Counsel, continue.

4  BY MR. BOGGS:

5  Q    Could you observe the demeanor of the persons on board the

6  target of interest vessel?

7  A    Yes, sir.

8  Q    What was that?

9  A    They were quiet, compliant and -- yeah.

10 Q    Were they placed in any kind of handcuffs or personal

11 restraint?

12 A    No, sir.

13 Q    Were they allowed to sit?

14 A    Yes, sir.

15 Q    How long, ballpark figure, were you beside the target of

16 interest vessel in the small boat?

17 A    For what duration?

18 Q    How many hours?

19 A    Oh.  I would say at last four, if not more.

20         THE COURT:  From the point that you came alongside

21 them until what point?

22         THE WITNESS:  Um, I would say within two -- two hours

23 we got authorization to conduct a law enforcement boarding, and

24 then we went on -- onto the vessel.

25         THE COURT:  And you were there for two hours?

1                      THE WITNESS:  Yes, ma'am.

2                      THE COURT:  All right.

3       BY MR. BOGGS:

4       Q    Is it part of the procedure to ask -- well, the questions

5       that your assistant boarding officer was asking, were those

6       the -- were those part of standard procedure?

7       A    Yes, sir.

8                      THE COURT:  Well, how do you know if you don't know

9       what he was asking?

10                     THE WITNESS:  I'm sorry?

11                     THE COURT:  How do you know if they're part of

12      procedure if you don't know what he was asking?

13                     THE WITNESS:  We take forms with us underway, I had a

14      copy and he has a copy as well, and as he relays it in Spanish,

15      he repeats back to me in English and we both write it down,

16      make sure the information is correct before we relay it up the

17      chain of command.

18                     THE COURT:  So he was doing his own translation

19      both -- I guess question one, he would ask it in Spanish and

20      then he would tell you what he just asked and he would tell you

21      what the answer was?

22                     THE WITNESS:  Yes, ma'am.

23                     THE COURT:  In English.

24                     THE WITNESS:  Yes, ma'am.

25                     THE COURT:  Are the questions written in Spanish on

1  the piece of paper or are they written in English on the piece

2  of paper?

3          THE WITNESS:  They're written in English.

4          THE COURT:  Counsel, you may continue.

5  BY MR. BOGGS:

6  Q    Did those questions that are written, written out, and

7  that were being performed in Spanish by your assistant boarding

8  officer, did those questions get asked within the first few

9  minutes of boarding?

10 A    Yes.

11 Q    And did you relay those, as you've mentioned earlier,

12 again, in those first few minutes of the right of visit

13 boarding?

14 A    Yes, sir.

15 Q    Did it take thereafter --

16          THE COURT:  Counsel, now you're leading.

17 Q    Law enforcement boarding authorization, how much longer

18 after that, the relaying of the questions, did it take before

19 you received that law enforcement authorization boarding?

20 A    I would say around two hours.

21 Q    Did you eventually run into some weather difficulties?

22 A    Yes.  We -- there was heavy rain earlier and then a

23 lightning storm approached while we were finishing our

24 law enforcement boarding.

25 Q    Back again to the initial questions.

1          Since you were -- heard an answer in English and

2    relayed it up the chain of command, were you aware of any

3    particular answer to the question of purpose of voyage?

4          MS. SWEENEY:  Your Honor, I'm going to object because

5    it calls for speculation that what was relayed to her by

6    someone else was accurate.

7          THE COURT:  Sustained.

8    BY MR. BOGGS:

9    Q    Let me ask you this.  Do you know what happens with the

10   information that you relay up your chain of command as a result

11   of these right of visit boarding questions?

12   A    Yes, sir.  So the information that we relay up goes to the

13   host nation, and they will verify the information on there is

14   correct with their system as well.

15   Q    Do you know whether or not countries in that region have

16   certain registration or trip requirements of boats leaving from

17   their jurisdictions?

18   A    Yes.  So they have what is called --

19         THE COURT:  Who is "they"?

20         THE WITNESS:  Most Latin countries in South America,

21   Central America and other islands, they have what is called a

22   zarpe.

23         THE COURT:  Wait one second.  I don't know about all

24   of the different South American islands and countries, I just

25   want to know about the one that you communicated with in this

1    instance.  Do you know who that was?

2              THE WITNESS:  The Dominican Republic.

3              THE COURT:  So just tell me about the Dominican

4    Republic.

5              THE WITNESS:  So they have what is called a zarpe,

6    and on this zarpe it allows mariners to leave the waters, and

7    on the zarpe it has very detailed --

8              THE COURT:  Can you spell zarpe.

9              THE WITNESS:  Yes.  It is Z-A-R-P-E.

10             THE COURT:  And it has detailed instructions.

11   Continue.

12             THE WITNESS:  It has detailed information about how

13   long their voyage will be, what the purpose of their voyage is,

14   how many persons are on that voyage, where they will depart

15   from, where they will return to, and what type of catch or fish

16   or what they're -- what they're out for, and that information

17   is held by the host nation.

18   Q    So are these some of the same questions you're asking in

19   that initial right of visit boarding?

20   A    Yes, sir.

21   Q    Is that information shared with the host nation?

22   A    Yes, sir.

23   Q    Does that help determine the registry of the vessel?

24   A    Yes, sir.

25   Q    At what point, if any, were the passengers on board the

1  target of interest vessel authorized to be treated as

2  detainees?

3  A    You asked at what time?

4  Q    I'm sorry.  Yes.  At what time in this period of hours?

5  A    Okay.  So after we got permission to do the

6  law enforcement boarding, we started off by doing ion scan

7  swabs, which are to detect minute amounts of narcotics, and as

8  we were going through our law enforcement boarding, that is

9  when I was relayed from my chain of command that we had the

10 authorization to treat the three persons on board the target of

11 interest as detainees.

12 Q    As part of the law enforcement boarding, did anyone on

13 your team use a narcotics identification kit?

14 A    Yes.

15       MS. SWEENEY:  Objection as to relevancy.

16       THE COURT:  Overruled.

17 A    Yes, sir.

18 Q    The answer was yes?

19       When did that happen?

20 A    I don't remember the approximate time because I was still

21 on the target of interest and a crew member back on the ARGAS

22 conducted the narcotics identification test, but, yeah, I'm

23 not -- I'm not sure the exact time of when that happened.  It's

24 when I was underway.

25 Q    Was that of the bale that was picked up earlier in the

1  debris field?

2  A    That was of the bale, yes, that we picked up on our way as

3  we were pursuing the vessel.

4  Q    But the test did not happen until law enforcement boarding

5  authorization was granted?

6  A    Yes, sir.

7       THE COURT:  So what did the whole discussion about

8  the ion scanning have to do with the point of authorization of

9  law enforcement boarding?

10       THE WITNESS:  Once we get authorization to do a

11  law enforcement boarding, there's certain items that we need to

12  do, such as the ion scan swabs, we need to account for the

13  space on the vessel in order to progress through the

14  law enforcement boarding, and as we progress through, as my

15  Deployable Team Leader is speaking with the host nation, that

16  is when the determination is made on whether or not the three

17  POB will be treated as detainees.

18       THE COURT:  And so the question was at what point

19  were they authorized to be treated as detainees, and have you

20  answered that yet?

21       THE WITNESS:  No, ma'am, I did not.

22       THE COURT:  At what point?

23       THE WITNESS:  Midway through the boarding.

24       THE COURT:  Midway through the boarding.

25       THE WITNESS:  Yes, the law enforcement boarding.

1          THE COURT:  So about an hour in?

2          THE WITNESS:  Yes, ma'am.

3          THE COURT:  So how far into all of this

4    law enforcement work had you gone -- had you finished

5    ion scanning?

6          THE WITNESS:  Yes, ma'am.

7          THE COURT:  Had you finished looking at all the

8    compartments?

9          THE WITNESS:  No, ma'am, we had not at that time.

10          THE COURT:  When did you get on the vessel?

11          THE WITNESS:  I got on the vessel when we started

12    preparing to treat the POB as detainees.

13    BY MR. BOGGS:

14    Q    POB meaning persons on board?

15    A    Yeah, the persons on board the vessel.

16          THE COURT:  Well, "when" is a temporal question.

17    When in the first hour did you join the on board team, or was

18    it in the second hour of the law enforcement boarding?

19          THE WITNESS:  Yes, ma'am, it was in the second hour.

20          So the ion scan swabs and the accounting for space is

21    something I was delegating through my team members that were

22    on board that vessel.

23          THE COURT:  How did you get on the vessel?

24          THE WITNESS:  I cross-decked.  We made sure we

25    married up the boats and I jumped on board to the target of

1    interest.

2              THE COURT:  Counsel, you may continue.  I just -- I'm

3    very confused, but go ahead.

4              MR. BOGGS:  Thank you, Your Honor.  I only have a

5    couple more questions.  I'm tempted to ask more because I don't

6    want the Court to be confused.

7              THE COURT:  Well, I'm not going to be confused when I

8    finish, but I just -- if you have some more questions, you can

9    ask them.

10             MR. BOGGS:  All right.

11   BY MR. BOGGS:

12   Q    The statements that were relayed to you by your assistant

13   boarding officer, were those relayed hours before this

14   law enforcement boarding?

15   A    Yes, sir.

16   Q    Did you observe the demeanor of the persons on board from

17   time to time during all of the four -- approximately four hours

18   that you were beside the vessel?

19   A    Yes, sir.

20   Q    At any time did you see anyone in distress?

21             MS. SWEENEY:  Objection.  Calls for speculation.

22             THE COURT:  Overruled.  You can answer.

23   A    No, sir.

24   Q    Were the -- if you know, were the persons on board

25   afforded the opportunity to go to the bathroom if they wanted?

1    A    Yes, sir.

2              THE COURT:  When?

3              THE WITNESS:  Whenever they needed to use the

4    restroom, my translator would let me know, and out of respect,

5    I would -- you know, being the only female, I would just turn

6    and they would use the bathroom off the side of the vessel.

7              THE COURT:  Well, you were only on the boat for an

8    hour.  So in the first three hours would you have any way to

9    know whether they had to use the restroom, communicated the

10   need to use the restroom or used the restroom?

11             THE WITNESS:  Yes, ma'am.  They would just pee off

12   the side of the boat, as -- I'm not sure.

13             MR. BOGGS:  May I follow up?

14             THE COURT:  Yes, sir.

15   BY MR. BOGGS:

16   Q    This entire time we've been talking about, the two

17   vessels, are they right next to each other?

18   A    Yes.

19   Q    Can you see and hear what's going on on the target of

20   interest vessel from your vessel?

21   A    Yes.

22             THE COURT:  How big is the target vessel?

23             THE WITNESS:  It was about 45 feet.

24             THE COURT:  And how big is your vessel?

25             THE WITNESS:  About the same size, give or take a few

1   feet.

2          THE COURT:  And how far away were you from the

3   individuals on the target vessel where you were standing when

4   you were providing cover?

5          THE WITNESS:  So I was on the bow of the vessel and

6   they were also on the bow of the vessel, so it was probably

7   about a six foot gap between the extra materials on the boat.

8          MR. BOGGS:  May I have one moment, Your Honor?

9          THE COURT:  Um-hum.

10          MR. BOGGS:  Your Honor, thank you.  That is all

11   I have on Direct Examination.

12          THE COURT:  All right.  Counsel.

13          MS. SWEENEY:  Yes, Your Honor.

14          **CROSS-EXAMINATION OF PETTY OFFICER RAVEN PERRY**

15   **BY MS. SWEENEY:**

16   Q    Ma'am, what are the boarding officers' duties?

17   A    The boarding officers' duties are to ensure that the team

18   is safe, the individuals are safe, to make sure that the series

19   of events for the boarding flow in their direct progression and

20   to make sure that the case package is done correctly.

21   Q    So you also put together the case package?

22   A    Yes, ma'am.

23   Q    Does that mean you reviewed every document, video,

24   photograph to make sure it was accurate before you allowed it

25   to go in the package?

1   A    Yes, ma'am, except for the video.  I don't recall

2   reviewing the video.  We didn't have that yet.

3   Q    And you did then review the case package in this case?

4   A    Yes, ma'am.

5   Q    Did you review the case package prior to coming here

6   today?

7   A    Yes, ma'am.

8   Q    Are you aware that there is not a single sentence that

9   there were ion scans done in the case package?

10  A    No, ma'am.

11  Q    Do you think you could be confused with another case, if

12  I tell you there is nothing in the case package about ion scans

13  being performed on the people on board?

14  A    Well, we do not perform ion scans on people, ma'am.

15  Q    Okay.  And that there is nothing on ion scans of anything

16  onboard in the case package?

17  A    What was the initial question?

18  Q    There is nothing in the case package that states ion scans

19  were performed.  Could you be confusing this with another case?

20  A    No, ma'am.

21  Q    And you're saying that there were ion scans noted in the

22  case package?

23  A    No, ma'am.

24  Q    So that's not something you'd put in the case package,

25  that you did ion scans?

1   A    We had contraband and we did two NIK tests for presumptive

2   positive for cocaine.

3   Q    You just said on Direct you did ion scans and went into

4   some detail that you did ion scans, and that you've reviewed

5   the case package.  If you had done ion scans, they would be in

6   the case package, correct?

7   A    Yes, ma'am.

8   Q    So if they're not in the case package, you've got this

9   confused with another case?

10  A    I'm not sure quite what you want me to say.

11  Q    You are a law enforcement officer, as you've testified,

12  correct?

13  A    Yes, ma'am.

14  Q    You're enforcing the maritime laws of the United States.

15  A    Yes, ma'am.

16  Q    So you've mentioned you're trained to conduct searches,

17  seizures and arrests.

18  A    Yes, ma'am.

19  Q    And one of your missions is drug interdiction, especially

20  in that part of the world.

21  A    Yes, ma'am.

22  Q    And you're aware in the Eastern Pacific there are also

23  pirates in the area?

24  A    Yes, ma'am.

25  Q    And you said you did not see the boat -- what's referred

1  to as target of interest when your first boat broke down,

2  correct?

3  A    No, ma'am.

4  Q    When you were approaching, there was a heavy rainstorm?

5  A    Yes, ma'am.

6  Q    There were waves?

7  A    Not great waves, no, ma'am.

8  Q    But there was rocking and visibility was impaired with a

9  heavy rainstorm, correct?

10 A    Yes, ma'am.

11 Q    So that means the people on that boat, their visibility

12 was impaired as well, correct?

13 A    I can't say for them what they did or didn't see.

14 Q    Now, aren't you equipped with GoPros?

15 A    Not all of the United States Coast Guard, no, ma'am.

16 Q    Were there GoPros at your disposal on the ARGAS?

17 A    I do not recall.

18 Q    You didn't have any with you?

19 A    I do not recall.

20 Q    You didn't film your approach?

21       THE COURT:  I'm confused now.  You're saying you

22 don't even know if you had GoPro cameras with you on this

23 vessel when you did this approach?

24       THE WITNESS:  I do not recall.

25       THE COURT:  Why don't you recall?

1          THE WITNESS:  I just don't want to make a false

2     statement in saying yes or no and I'm not 100 percent sure of

3     the answer.

4          THE COURT:  Do you usually have them?

5          THE WITNESS:  It -- it is a very -- it depends on

6     where you deploy to or what team you're on.

7          THE COURT:  Counsel, you may continue.

8     BY MS. SWEENEY:

9     Q    You're also trained in firearms, correct?

10    A    Yes, ma'am.

11    Q    And there -- I was a little confused during your Direct.

12    Were there six people total on your boat?

13    A    No, ma'am.

14    Q    Five?  There were five?

15    A    Yes, ma'am.

16    Q    Everyone was armed?

17    A    Yes, ma'am.

18    Q    Everyone was trained in the arms, in the firearms?

19    A    Yes, ma'am.

20          THE COURT:  I'm sorry.  Which boat are we talking

21    about now?

22          MS. SWEENEY:  I'm sorry.  The boat that

23    law enforcement Coast Guard is on had five --

24          THE COURT:  The first boat, not the small boat?

25          MS. SWEENEY:  No, the small boat.

1  BY MS. SWEENEY:

2  Q    Am I correct, Officer, there were five --

3  A    The small boat.

4  Q    -- armed people on the small boat?

5  A    Yes, ma'am.

6  Q    And they were all trained in the use of those firearms?

7  A    Yes, ma'am.

8  Q    They were all trained in law enforcement?

9  A    Three of us are, yes, ma'am, and then the other two

10 cockswains are strictly for the British crew for the boat.

11 Q    I'm going to direct your attention to the time before you

12 were at the boat.  There were things that had been relayed to

13 you about this boat, correct?

14 A    Yes, ma'am.

15 Q    You were notified that the boat was a target of interest?

16 A    Yes, ma'am.

17 Q    You were notified that this boat was going in a northerly

18 direction that is consistent with drug smuggling trends?

19 A    Yes, ma'am.

20 Q    And that this is a drug smuggling route and areas?

21 A    Yes, ma'am.

22 Q    That the boat was traveling low in the water?

23 A    Yes, ma'am.

24 Q    And that go -- and that those boats are frequently called

25 go-fast vessels?

1    A    Yes, ma'am.

2    Q    Go-fast vessels, in your experience, are frequently used

3    in drug smuggling?

4    A    Yes, ma'am.

5    Q    There were no navigation lights on?

6    A    Yes, ma'am.

7    Q    And you could not determine a nationality, the aircraft,

8    correct?

9    A    Yes, ma'am.

10   Q    You knew all of those things prior to approaching this

11   boat --

12   A    Yes, ma'am.

13   Q    -- correct?

14        And these are all facts that are consistent with drug

15   smuggling cases you've handled in the past?

16   A    Yes, ma'am.

17   Q    And prior to approaching the boat, you claim that you saw

18   a jettison of bales over the side of the vessel?

19   A    Yes, ma'am.

20   Q    Was this during the heavy rainstorm?

21   A    No, ma'am.

22   Q    And this bale was retrieved before stopping the go-fast

23   vessel?

24   A    Yes, ma'am.

25   Q    This bale was consistent with other bales you'd seen and

1  recovered on prior drug interdictions?

2  A    Yes, ma'am.

3  Q    So prior to stopping this boat, would you agree with me

4  that you had a reasonable suspicion these were drug smugglers,

5  based on what you already knew?

6  A    Yes, ma'am.

7  Q    As you came up upon the vessel, your weapon was drawn and

8  at the ready?

9  A    Yes, ma'am.

10  Q    So was Officer Villaseñor?

11  A    Yes, ma'am.

12  Q    And Officer Barber?

13  A    Yes, ma'am.

14  Q    You pulled up side-by-side with the boat.  Now -- correct?

15  A    Yes, ma'am.

16  Q    At that point Officers Barber and Villaseñor got into the

17  target of interest boat?

18  A    Yes, ma'am.

19  Q    At this point you say that you had -- they turned off the

20  engine.

21  A    Yes, ma'am.

22  Q    So you had moved them to the front of the boat, they were

23  all huddled together, the people on board?

24  A    Yes, ma'am.

25  Q    How close to them was Officer Villaseñor and Officer

1   Barber?  Within inches?

2   A    No, ma'am.  It was -- it was feet.

3   Q    How many feet?

4   A    I don't know approximately, but I would say maybe ten,

5   ten feet.

6   Q    So as you were moving or as -- to use your term, mustering

7   the people to the front of the boat, the guns were still drawn?

8   A    Only my gun was drawn.

9   Q    Did Officers Villaseñor and Barber help move them to the

10  front of the boat?

11  A    Physically?

12  Q    Yes.

13  A    No, sir.

14  Q    And there is no recording, audio or visual, of this, of

15  them climbing into the boat and the people on board moving to

16  the front of the boat?

17  A    I'm not -- I don't believe so.  I'm not sure.

18           THE COURT:  Well, which answer is it, you don't know

19  or you're not sure or you don't know either way?

20           THE WITNESS:  Well, there's footage from the plane.

21  Q    Well, have you reviewed the case package?  That would have

22  been part of the case package, right?

23  A    Yes, ma'am.

24  Q    Do you recall seeing that at all?

25  A    I am not sure.

1   Q    Now --

2              THE COURT:  Well, I'm confused.  When did you see the

3   case package last?

4              THE WITNESS:  I saw the case package last a few days

5   ago.

6              THE COURT:  And did you see video?  That's something

7   you wouldn't forget.

8              THE WITNESS:  The video -- the case package is a

9   physical copy.  I didn't have an electronic copy of the video.

10             THE COURT:  Did you see an indication of the

11  existence of the video when you saw the case package?

12             THE WITNESS:  Yes, ma'am.

13             THE COURT:  And so there is a video indicated to be

14  in the case package?

15             THE WITNESS:  I'm sorry, what was that?

16             THE COURT:  There is a video indicated to be in the

17  case package?

18             THE WITNESS:  A video indicated of the plane?

19             THE COURT:  Of anything.  Is there anything in the

20  case package that references the presence of a video?

21             THE WITNESS:  I'm -- I'm not sure at this point.

22             THE COURT:  You just saw this a couple of days ago.

23             THE WITNESS:  It's very large and --

24             THE COURT:  The answer is yes?

25             THE WITNESS:  I saw it a couple -- yes, ma'am.

 1          THE COURT:  And you don't remember whether there's a
 2    reference to a video in it?
 3          THE WITNESS:  I don't want to say yes or no and be
 4    wrong, so I'm just going to say I'm not sure.
 5          THE COURT:  Counsel, is there a video referenced in
 6    the package?
 7          MR. BOGGS:  Your Honor, I don't know --
 8          THE COURT:  Yes or no?
 9          MR. BOGGS:  There is a video that has been turned
10    over to defense.  We all know there's a video.  There's no
11    question about that.
12          THE COURT:  Well, I don't know it and that's who
13    needs to know it is the Judge who is trying to decide the
14    suppression motion, and this is the first I'm hearing of it, so
15    is there a video of the events that we're talking about today?
16          MR. BOGGS:  It does not include the questioning or
17    anything like that.  There is a video, as the witness stated.
18          THE COURT:  Is there a video that I can see of the
19    boarding and all of that police --
20          MR. BOGGS:  It does not include the boarding.  The
21    only thing that -- it does show the initial approach, is what
22    I've seen.  It's been -- it was turned over in discovery many
23    months ago.
24          THE COURT:  And it just cut off out of nowhere?
25          MR. BOGGS:  I believe so, Your Honor.

1              THE COURT:  All right.  Let me see it before I decide

2     the motion, but go ahead with your questions.

3     BY MS. SWEENEY:

4     Q    When Officer Villaseñor was questioning the people

5     on board, did he remain on the target of interest boat that

6     entire time?

7     A    Yes, ma'am.

8     Q    As did Officer Barber?

9     A    Yes, ma'am.

10    Q    If Mr. Varga had asked you that he wanted to leave, you

11    would have told him no, correct?

12    A    I feel like that's speculation.  I'm not sure quite what

13    you mean.

14             THE COURT:  Well, you're not the lawyer.  Just answer

15    the question.

16    A    I'm not -- I'm not sure what you're --

17    Q    If he had said "I want to leave," you would have said no?

18    A    I guess, yes.

19    Q    If he had tried to start the boat and keep the boat

20    running or turned the boat back on and tried to leave, would

21    you have stopped him?

22    A    Yes, ma'am.

23             MS. SWEENEY:  Your Honor, may I have a moment to

24    confer with my co-defendant's counsel?

25             THE COURT:  You may.

1   BY MS. SWEENEY:

2   Q    Ma'am, just to clarify, you yourself saw the jettison?

3   A    Yes, ma'am.

4   Q    And the target of interest boat had no drugs on it when

5   you were on that boat?

6   A    Yes, ma'am.

7   Q    And in fact you said ion scans were done on the surfaces

8   of the boat.  What were the results?

9   A    I'm not sure.  When I was referencing that, I was going

10  through the evolutions of what a law enforcement boarding looks

11  like.

12  Q    Ma'am, you said there were ion scans done on this boat

13  I think in Direct.  Is that still your answer?

14  A    Yes, ma'am.

15  Q    Okay.  What were the results?

16  A    I just told you I don't know.

17        MS. SWEENEY:  Okay.  Thank you.  I have no other

18  questions.

19              THE COURT:  Yes, sir.

20              MR. BOGGS:  May I?

21              THE COURT:  Yes, sir.

22        **REDIRECT EXAMINATION OF PETTY OFFICER RAVEN PERRY**

23  **BY MR. BOGGS:**

24  Q    Officer Perry, approximately how many boardings do you do

25  in a typical year?

1        MS. SWEENEY:  Objection as to relevancy, beyond the

2    scope of Direct.

3            THE COURT:  Overruled.

4            MS. SWEENEY:  I'm sorry.  Cross.  Excuse me.

5            THE COURT:  You may answer.

6            THE WITNESS:  Okay.

7    A    In a year, it can be anywhere from 30 to 80.

8    Q    And the case package, you were asked questions about the

9    case package, is that compiled by many different components of

10   the Coast Guard?

11   A    Yes, sir.

12   Q    Are you the author of the case package?

13   A    No, sir.

14   Q    The paper portion of the case package, generally how many

15   pages?

16   A    A hundred plus.

17   Q    So you mentioned that you reviewed it, but you didn't

18   write it?

19   A    No, sir.

20   Q    If there were ion scans performed on a particular

21   boarding --

22            THE COURT:  On this boarding or some general

23   boarding?

24   BY MR. BOGGS:

25   Q    In a general boarding.  Would you be the person who --

1          MS. SWEENEY:  Objection as to relevancy.

2          THE COURT:  She can answer the question.

3   Q    Would you be the person who wrote whether or not it

4   happened in the case package?

5   A    It depends, because the case package is compiled by the

6   entire team.

7          THE COURT:  So it might be you or it might be

8   somebody else?

9          THE WITNESS:  Yes, ma'am.

10  Q    If it happened in a particular case, you would be the

11  person to relay that information on up the chain; is that the

12  way it works?

13  A    Yes, sir.

14  Q    And at this point somebody else is responsible for putting

15  it in the case package?

16  A    Yes, sir.

17         MR. BOGGS:  That's all I have, Your Honor.

18  Thank you.

19         THE COURT:  One second.

20         You don't speak any Spanish other than basic hello

21  kind of things?

22         THE WITNESS:  Yes, ma'am.

23         THE COURT:  And if your officer asks a detainee or

24  a -- I don't know what you call the people, a person of

25  interest, a question across the deck of a boat, ten feet away

1   from that person, and you don't speak Spanish, is there any way

2   for you to know what they just asked that person?

3         THE WITNESS:  When he speaks Spanish, I would not

4   know, no, because I don't speak it.

5         THE COURT:  And so when he relays the answer to you,

6   you can only assume that the question related to the answer and

7   the answer was spoken in response to the question?

8         THE WITNESS:  Yes, ma'am.  He usually will relay the

9   question asked and the answer to that question.

10        THE COURT:  In English.

11        THE WITNESS:  Yes, ma'am.

12        THE COURT:  But if he didn't ask that question that

13   he's telling you he asked, you would have no way to verify

14   that?

15        THE WITNESS:  No, ma'am.

16        THE COURT:  And you didn't record any part of the

17   questioning in Spanish or in English on a GoPro or any other

18   kind of recording device?

19        THE WITNESS:  No, ma'am.

20        THE COURT:  And you all have access to these devices

21   if you want to use them?

22        THE WITNESS:  No, ma'am.

23        THE COURT:  You never have access to them?

24        THE WITNESS:  We have access sometimes, equipment

25   does fail though, and we don't have enough for the entire unit

1  to use, so certain teams may take them and we may not have the

2  availability to have them with us.

3          THE COURT:  But you don't know whether you did or

4  didn't have them this day?

5          THE WITNESS:  No, ma'am.

6          THE COURT:  Or if they were or were not functioning?

7          THE WITNESS:  No, ma'am.

8          THE COURT:  The confusion I had was over this

9  question about what happened before you got authorization for

10  law enforcement boarding and what happened after you got that

11  authorization, and I think my confusion was because there is

12  another time that's pertinent and that is the authorization to

13  treat the individuals as detainees.  So when in the course of

14  this -- you said it was two hours in that you got authorization

15  for law enforcement boarding?

16          THE WITNESS:  So when we do the approach phase, once

17  all the questions have been asked and answered, we route that

18  up through our chain of command, they pass that to the host

19  nation, and then we wait for them to make the determination on

20  whether or not we can do a law enforcement boarding.  So

21  that -- those hours of waiting is us waiting for that response

22  to say we are authorized to do the law enforcement boarding.

23          THE COURT:  And that took about two hours in this

24  instance?

25          THE WITNESS:  Yes, ma'am.

1          THE COURT:  And then once that authorization was

2     given, your crew started law enforcement boarding --

3          THE WITNESS:  Yes, ma'am.

4          THE COURT:  -- activities?

5          THE WITNESS:  Yes, ma'am.

6          THE COURT:  And that included these ion scans that

7     you said was done?

8          THE WITNESS:  Yes, ma'am.

9          THE COURT:  And then once they were given permission

10    to treat them as detainees, that's the point at which you got

11    on the boat?

12         THE WITNESS:  Yes, ma'am.  I made sure that they were

13    properly suited in their personal floatation devices and safely

14    transferred onto the vessel to go back to the ARGAS, and at

15    that time I went over with Petty Officer Barber to finish out

16    the law enforcement portion of the boarding, because I sent my

17    translator back to the vessel so that he could relay any

18    information.

19         THE COURT:  To which vessel?

20         THE WITNESS:  I'm sorry?

21         THE COURT:  You sent your translator back to the

22    vessel.  Which vessel are you referring to?

23         THE WITNESS:  To the ARGAS, with the detainees.

24         THE COURT:  And the detainees, before they became

25    detainees, when they were just sitting on the bow of the

1  vessel, they were just doing that voluntarily?

2          THE WITNESS:  Yes, ma'am.

3          THE COURT:  And how long were they under cover with

4  you before you put your weapon away?

5          THE WITNESS:  I would say between five to ten

6  minutes.

7          THE COURT:  If we were to have the video, would the

8  video show your team saying, hi, guys, we're the Coast Guard,

9  I'm going to need you to go sit up front, or would your video

10  show them saying -- being forceful and loud and saying, go up

11  front, get there now, sit, don't move, that kind of stuff?

12          THE WITNESS:  The audio would -- so our translator

13  would say it in Spanish, and at first when we do come up we do

14  say it loudly, because the engines are going, and just to make

15  sure that they can hear the task direction given to them, but

16  once the noise is gone and all that stuff, it's just a normal

17  conversation.

18          THE COURT:  With you holding a gun until they get to

19  where they're supposed to be?

20          THE WITNESS:  I'm sorry?

21          THE COURT:  You're holding a gun on them until they

22  get to the front of the boat and sit down, for the safety of

23  your other two officers who are on the boat?

24          THE WITNESS:  Yes, ma'am.

25          THE COURT:  And no one is confused about whether they

1   can voluntarily sit down or they can sit down of their own

2   accord?

3            THE WITNESS:  They are just following the task

4   direction that was given to them.

5            THE COURT:  Under force of a weapon.

6            THE WITNESS:  It's level one officer presence.

7            THE COURT:  I'm not suggesting that it shouldn't be.

8            THE WITNESS:  Oh.

9            THE COURT:  I'm just suggesting that if someone is

10  holding a gun to you and they say, sit on the front of boat,

11  you're generally going to do that.

12           THE WITNESS:  Yes, ma'am.

13           THE COURT:  Anything?

14           MR. BOGGS:  I just would like to clarify something,

15  the last question there, for example.

16  BY MR. BOGGS:

17  Q    I just want to make this clear, if it's not already clear.

18           At the point that your officers are on the boat

19  having the persons on board muster to the front, you're the

20  only person who has a weapon drawn, correct?

21  A    That is correct.

22  Q    And you're on the other boat?

23  A    Yes.  Yes, sir.

24  Q    You've been asked a lot of questions about the video, and

25  I just want to ask you -- well, we're going to provide the

1  video to the Court.  Do you remember having seen it at any

2  point?

3  A    The video?  Yes, sir.

4  Q    And is it a video that was taken from long range, from,

5  I think you said, the aircraft?

6  A    Yes, it's from the aircraft.

7  Q    So does it -- can you hear anything that's going on --

8  A    No.

9  Q    -- at the level of the boats?

10  A    No, sir.  No, sir.

11        MR. BOGGS:  Okay.

12        THE COURT:  When did you last see the video?

13        THE WITNESS:  I reviewed the video today.

14        MR. BOGGS:  Your Honor, we showed the video --

15        THE COURT:  One second.  I don't want you to testify,

16  Counsel.

17        MR. BOGGS:  I just --

18        THE COURT:  I don't want you to testify, Counsel.

19        MR. BOGGS:  I'm not testifying.

20        THE COURT:  Well, I don't want you to make a

21  statement in front of the witness, Counsel.

22        MR. BOGGS:  All right.  This --

23        THE COURT:  I don't want you to make any statement in

24  front of the witness.

25        MR. BOGGS:  Okay.  Okay.

1          THE COURT:  Any Recross, Ms. Sweeney?

2          MS. SWEENEY:  No, Your Honor.

3          THE COURT:  I don't understand, Officer, how you

4    didn't recall ten minutes ago whether you saw a video, and

5    today on Redirect you now remember you saw the video today.

6          THE WITNESS:  I was confused initially on what she

7    was referring to.

8          MR. BOGGS:  Your Honor, the question was whether --

9          THE COURT:  Counsel.

10         MR. BOGGS:  I just --

11         THE COURT:  Counsel, you can make an argument after

12   the witness gets off the stand all day long.

13         MR. BOGGS:  Happy to do so.

14         THE COURT:  "And did you see the video?  That's

15   something you wouldn't forget."

16         "The video -- the case package is a physical copy.

17   I didn't have an electronic copy of the video."

18         "Did you see an indication of the existence of the

19   video when you saw the case package?"

20         And there -- "Yes, ma'am."

21         Question mark.  And there is a video indicated to be

22   in the case package?  I think that's my question.

23         I'm sorry.  What was that?

24         Is there a video indicated to be in the case package?

25         Witness:  A video indicated of the plane?

1          Court:  Of anything.  Is there anything in the case

2    package that reference the presence of a video?

3          I'm not sure at this point.

4          You just saw this a couple of days ago.

5          It's very large and --

6          The answer is yes?

7          I saw it a couple --

8          Yes, ma'am.  And you don't remember whether there's a

9    reference to a video in it?

10          I don't want to say yes or no and be wrong, so I'm

11   just going to say I'm not sure.

12          That was confusing to you?

13          THE WITNESS:  Yeah, I was confused initially by the

14   question that she was asking.

15          THE COURT:  Those were the Court's questions.

16          You may step down.  You may step down.

17          THE WITNESS:  Okay.  Counsel, call your next witness.

18          MR. BOGGS:  The United States calls Officer Marcos

19   Villaseñor.

20          THE COURT:  Wait until the other witness comes into

21   the courtroom before the other witness goes out.

22      *(Petty Officer Marcos Villaseñor enters proceedings.)*

23          THE COURT:  Please come forward down to the table,

24   sir, to be sworn.

25          COURTROOM DEPUTY:  Please raise your right hand.

1            Do you solemnly swear or affirm, under penalty of
2    perjury, that the statements you give in these proceedings will
3    be the truth, the whole truth and nothing but the truth?
4            THE WITNESS:  I do, ma'am.
5            COURTROOM DEPUTY:  Please state your name for the
6    record.
7            THE WITNESS:  Marcos T. Villaseñor.  Last name is
8    Victor India Lima Lima Alpha Sierra Echo November Oscar Romeo.
9            THE COURT:  Thank you, sir.  You may have a seat.
10            State your name again, sir, for me.
11            THE WITNESS:  Marcos T. Villaseñor.
12            THE COURT:  You're under oath, sir.  You have to give
13    truthful answers.  If you give false answers, you face
14    penalties of perjury, false statement and obstruction.  Do you
15    understand that?
16            THE WITNESS:  I do understand, Your Honor.
17            THE COURT:  Wait until the question is complete
18    before you start your answer so you're not confused, and do not
19    talk over Counsel, even if you can anticipate what his question
20    is going to be.  Do you understand that?
21            THE WITNESS:  I understand.
22            THE COURT:  Counsel.
23    **DIRECT EXAMINATION OF BOARDING OFFICER MARCOS VILLASEÑOR**
24    **BY MR. BOGGS:**
25    Q    By whom are you employed?

1    A    I'm hired by the U.S. Coast Guard.

2    Q    What is your position there?

3    A    My position is a boarding officer.

4    Q    How long have you been with the United States Coast Guard?

5    A    I've been in for approximately four years.

6    Q    What was your training for your position as a boarding

7    officer?

8    A    My training consisted of a six month rigorous PQS JQR

9    training, handbook, where I had to demonstrate knowledge,

10   proficiency and demonstrate scenario-based qualifications

11   topped with weapons handling, judgment, use of force.

12   Q    Can you maybe move a little closer to the microphone.

13           THE COURT:  And you can pull it down a little bit.

14           What is PQS?

15           THE WITNESS:  It's a --

16           THE COURT:  What does it stand for.

17           THE WITNESS:  Personal Qualification Standard.

18           THE COURT:  And what's JQR, I think you said?

19           THE WITNESS:  Yes.  It's a --

20           THE COURT:  What does it stand for?

21           THE WITNESS:  Job Qualification Record.

22           THE COURT:  Counsel.

23   BY MR. BOGGS:

24   Q    Coast Guard uses lots of acronyms; isn't that right?

25   A    Yeah.

 1           THE COURT:  Well, try to use words, because you're
 2    communicating with non-Coast Guard people, myself in
 3    particular.
 4           THE WITNESS:  Will do, Your Honor.
 5           THE COURT:  Thank you.
 6    BY MR. BOGGS:
 7    Q    Where are you currently stationed?
 8    A    At San Diego TACLET Pacific.
 9    Q    As a boarding officer, do you spend time out on
10    Coast Guard cutters and other vessels?
11    A    Yes, sir.
12    Q    About approximately how much time do you personally get
13    out on the high seas?
14    A    So my time is divided into Coast Guard boats and other
15    allied nation warships, so about 50/50.
16    Q    50/50 between the --
17    A    Coast Guard and other allied warships and the Navy.
18    Q    And about how much during a given year are you out on the
19    high seas with either of those?
20    A    Approximately three, four months out of the year.
21    Q    How many -- this is ballpark figure, just trying to get a
22    background, how many boardings have you been a part of as a
23    boarding officer?
24    A    Approximately 40, 50 boardings.
25    Q    Okay.  And do you speak Spanish?

1    A    I do, sir.

2    Q    Does that make you a particularly valuable member of the

3    team out in the Eastern Pacific Ocean?

4    A    I am the interpreter for my team.

5    Q    Are most of the folks that you encounter in your job

6    out --

7              THE COURT:  Excuse me a second.

8              Mike, can you figure out what that is?

9              COURT SECURITY OFFICER:  Yes, Judge.

10             THE COURT:  Continue.

11   BY MR. BOGGS:

12   Q    Are most of the folks that you encounter out on the high

13   seas in your area Spanish speakers?

14   A    Yes, sir.

15   Q    As part of your training did you receive instruction in

16   boarding procedures?

17   A    Yes, sir.

18   Q    Did you receive training in safety generally?

19   A    Yes, sir.

20   Q    In boarding safety?

21   A    Yes, sir.

22   Q    Did you receive any training in boarding authority?

23   A    Yes, sir.

24   Q    The Coast Guard is a military organization, and do you

25   follow a chain of command?

1  A    Yes, sir.

2  Q    Do you ever board a boat without authorization?

3  A    No, sir.

4  Q    Have you ever done safety and document inspections?

5  A    Yes, sir.

6  Q    Do you know the difference between a right of visit

7  boarding and a full law enforcement boarding?

8            THE COURT:  One second.  Go ahead.

9  Q    Do you know the difference between a right of visit

10 boarding and a full law enforcement boarding?

11 A    Yes.

12 Q    Do each of those require separate authorization?

13 A    Yes, sir.  One comes before the other.

14 Q    And which one comes before the other?

15 A    The right of visit comes first to get authority to conduct

16 a law enforcement boarding.

17 Q    So right of visit boarding, what is -- what does that

18 entail?  That's the one that comes first, you said.  Okay.

19 What does that entail?

20 A    So the right of visit boarding is for us to verify the

21 nationality of the vessel in the form of questioning.

22 Q    Does that involve a standard set of questions?

23 A    Yes, sir.

24 Q    How many, approximately, questions?

25 A    Approximate 30 questions.

1   Q    Do you have those all memorized in your head or do you

2   take them with you in some form when you do it?

3   A    I don't have them memorized.  We have a Alpha Report where

4   they're all on there and I ask them one-by-one.

5   Q    Out on the high seas you have a -- is it a piece of paper?

6   Is it laminated?  What is it?

7   A    It's a piece of paper that's laminated, and I have a

8   grease pencil where I write on it.

9   Q    Okay.  Let me direct your attention to September of last

10  year.  Did you become involved in the investigation of Bernardo

11  Varga?

12  A    Yes, sir.

13  Q    Do you remember -- have you done a number of boardings

14  since then?

15  A    Yes, sir.

16  Q    Do you remember what Mr. Varga looks like?

17  A    Yes, sir.

18  Q    Do you see him in the courtroom?

19  A    Yes, sir.

20  Q    Could you describe where he's located.

21  A    He's sitting to my right of me in the orange.

22  Q    Okay.  Thank you.

23       I started with a question about, you know, did you

24  become involved in the investigation of Mr. Varga.  How did you

25  become involved in that investigation?

1  A    I was a part of the boarding team that went out that

2  night -- that day.

3  Q    Was that the 2nd of September of last year?

4  A    Yes.

5  Q    Earlier you told us that you spend some of your time on

6  boats with allied nations, some on Coast Guard cutters.  For

7  this particular occasion which was it?

8  A    This was the allied warship the ARGAS.

9  Q    And how did you come to encounter Bernardo Varga?

10  A    He was on the suspected target of interest vessel.

11  Q    How did you learn of the target of interest vessel?

12  A    We were briefed, there is a vessel out in the known drug

13  trafficking area, and we were launched to go verify the vessel.

14  Q    Did you encounter any -- well, let me ask you first, what

15  were you launched from and what were you launched on?

16  A    We were launched off the ARGAS, a British vessel, and we

17  were launched on an approximate 25-meter inflatable small boat.

18  Q    Did you encounter any difficulties on that inflatable

19  small boat?

20  A    Yes, sir.

21  Q    What?  What happened?

22  A    Once we launched in the water, we started transiting

23  towards the target of interest, we suffered an engine casualty,

24  so the engine just -- it stopped working, so we were just

25  floating there, and we got a call back to the ARGAS to send us

1    another boat so we can swap and continue the pursuit.

2    Q    Did you do that?

3    A    Yes, sir.

4    Q    Do you remember the time of these events?

5    A    The time of day?

6    Q    Yes, the time of day.

7    A    I don't recall the time of day.  It was --

8    Q    Do you remember if it was daytime or nighttime?

9    A    Daytime.

10   Q    About how long were you in pursuit of the target of

11   interest vessel after the boat swap?

12   A    Can you repeat the question?

13   Q    Yes.  Sorry.

14        You mentioned that there was a boat swap because your

15   boat had difficulties.  After the boat swap, about how long

16   were you in pursuit of the target of interest vessel before you

17   acquired it?

18   A    About 15, 20 minutes before we suffered the casualty.

19   Q    Okay.  Now, this is always hard.  I'm going to talk about

20   the time after the -- after the boat swap.

21   A    Um-hum.

22   Q    You said that --

23        THE COURT:  After your boat was swapped out for a new

24   boat, how long did it take you to reach the target vessel?

25        THE WITNESS:  Approximately maybe 30, 40 minutes.

1  Q     Was it still daytime?

2  A     It was still daytime.

3  Q     Okay.  At some point during your following the target of

4  interest vessel did you see a jettisoning -- jettisoning of

5  packages?

6  A     Yes, sir.

7  Q     When did that happen, approximately, ballpark figure?

8  A     Approximate 30, 40 minutes, we saw a vessel in the area

9  matching the same description, I saw a person, I don't know who

10  it was, tossing over bale-like items inside the water.

11  Q     Did you or anybody -- did you and your crew do anything as

12  a result of that?

13  A     Yes, sir.

14  Q     What did you do?

15  A     We stopped pursuit, we located one of the bales and we

16  marked the location with a buoy attached with a strobe.

17  Q     Did you resume pursuit after that?

18  A     Yes, sir.

19          THE COURT:  Well, now I'm confused.

20          When you saw the jettisoning of the bales, was that

21  before or after your boat had its problems?

22          THE WITNESS:  The boat had the problems before we

23  swapped, and then we went into pursuit and that's when we were

24  close enough to see the target of interest start dumping,

25  jettisoning over contraband, so we stopped the pursuit, grabbed

1   one of the bales, retrieved it onto our small boat, and then we

2   marked the bale field.

3          THE COURT:  And so when you said that your boat

4   reached the target vessel in 30 to 40 minutes, you're talking

5   about the point in time in which you saw the jettisoning occur?

6          THE WITNESS:  Yes, Your Honor.

7          THE COURT:  All right.  Counsel.

8   BY MR. BOGGS:

9   Q    Was it still daylight hours when you did make it to the

10  target of interest vessel?

11  A    It was closing -- it was a little closer to nighttime.

12  Q    Was there still light out at all, or can you remember?

13  A    There was a little light out.

14  Q    What happened when you closed in on the target of interest

15  vessel?

16         THE COURT:  I'm sorry.  Do you know what time of day

17  it was, whether it was nine o'clock, eight o'clock,

18  four o'clock, three o'clock, ten o'clock?  What time was it?

19         THE WITNESS:  I don't recall, Your Honor, but it was

20  closer to sunset.  Sunsets are usually later in the day out at

21  sea.  That's all I remember, Your Honor.

22         THE COURT:  Well, do you know what 2259 Zulu is?

23         THE WITNESS:  I do not know that specific time.

24         THE COURT:  So how do you know when is Zulu time when

25  you're making a report?

1          THE WITNESS:  There is an -- Your Honor, there's an

2     actual scale that it gets configured to that.

3          THE COURT:  When you put in your report, some random

4     scale changes the number?

5          THE WITNESS:  Yes, Your Honor.  That's what Zulu is.

6          THE COURT:  But -- so if I'm -- I am writing a report

7     and I am you and I need to record what time it is that

8     something happened, do I put in eight o'clock and the report

9     drafter changes that to Zulu, or do I write Zulu, if I am you?

10          THE WITNESS:  So there's a time scale, Your Honor,

11     and it matches up to whatever the time is, and it configures to

12     Zulu time.

13          THE COURT:  So if I read a statement that purports to

14     be your statement and there's Zulu time in it, is that

15     something you've recorded or is that something someone

16     translated it to?

17          THE WITNESS:  That's what I recorded with the actual

18     Zulu time change.

19          THE COURT:  There's some scale that you have

20     available to you?

21          THE WITNESS:  Yes, Your Honor.

22          THE COURT:  And then eight months later you would

23     have no idea what time it was when you said that?

24          THE WITNESS:  Yes, Your Honor.

25          THE COURT:  Counsel.

1    BY MR. BOGGS:

2    Q    If I could just ask a couple of questions on that.

3         Does the entire Coast Guard use Zulu time?

4    A    From my understanding for operations, yes.

5    Q    And is that so that it can --

6         THE COURT:  Counsel, you can ask him a Direct

7    question.

8    Q    If you know, is Zulu time --

9         THE COURT:  "Why is that" is the Direct question.

10        MR. BOGGS:  Well, that's not what I was going to ask,

11   but you can ask it.

12        THE COURT:  Well, your question started as

13   "And is that so that," and that's the answer to a why question,

14   so why does it do that, do you know?

15        THE WITNESS:  Your Honor, I have no idea why they use

16   Zulu time.  It's just a military thing.

17        THE COURT:  I get that, but what I don't understand

18   is that if someone told me it was 2200 hours, we all know what

19   that is in military time, I would be able to tell you that it

20   was, what, ten o'clock at night.

21        THE WITNESS:  Um-hum.

22        THE COURT:  And so I don't understand why whatever

23   Zulu time is, you can't look up at the sky, look up at your

24   watch, look up and think about the time you got out of bed and

25   went back to bed, you can't tell me now approximately what time

1    of day that was in Colombian time, Eastern Time or any other

2    kind of time.  You can't tell me what time of day it was, in

3    normal time?

4            THE WITNESS:  If I were to recall, Your Honor,

5    I would say it was approximately five or six o'clock.

6            THE COURT:  And then -- five or six o'clock at what

7    point?

8            THE WITNESS:  When we launched.

9            THE COURT:  The first time?

10           THE WITNESS:  Yes, Your Honor.

11           THE COURT:  Before your boat failed.

12           THE WITNESS:  Yes, Your Honor.

13           THE COURT:  So by the team you ultimately reached the

14   side of the target vessel, after you picked up this errant bale

15   of cocaine and moved on, approximately what time would it have

16   been when you reached the side of the vessel?

17           THE WITNESS:  Approximately six or seven o'clock.

18           THE COURT:  All right.  Counsel, continue.

19   BY MR. BOGGS:

20   Q    One more.  Just one more on Zulu time.

21           If you had the conversion could you answer the

22   Court's question?

23   A    Yes, sir.

24   Q    So, moving on, back to when you pulled up alongside the

25   target of interest vessel, what was going on at that time?

1   What happened?

2   A     So when we pulled up on the target of interest vessel,

3   I had my pistol drawn at the vessel along with my boarding

4   team.

5   Q     And why?

6   A     I didn't feel it was safe with these guys on board, what

7   they were going to do, since we -- they didn't stop for us or

8   the aerial asset we had underway, they didn't stop for them,

9   and they dumped something in the water that was -- could have

10  been contraband, so I didn't know what else they had on their

11  boat, so that's what I was going to defend myself and my

12  boarding team, and that's why I drew my pistol.

13  Q     How long did you have your pistol drawn?

14  A     Alongside them for a few minutes, that's when I began to

15  ask them in Spanish to go to the bow of the vessel, because one

16  of them was by the rear where the propulsion system is and

17  I needed everybody to the front so the vessel would stop

18  moving.

19  Q     Did you announce yourself as Coast Guard?

20  A     Yes, sir.

21  Q     And were you yelling that?

22  A     Yes, sir.

23  Q     And did the persons on board or particularly the one

24  person near the propulsion move to the front?

25  A     Yes, sir.

1  Q     Okay.  Then what did you do?

2  A     Once they moved to the front of the boat, I holstered my

3  pistol as well as Petty Officer Barber and we jumped over and

4  we pulled the kill switch for the engine and then we did a

5  quick initial safety sweep to make sure the vessel was

6  seaworthy for us and the crew members to be on.

7  Q     So two of you boarded the vessel initially?

8  A     Yes, sir.

9  Q     You and -- who was the other officer?

10 A     Petty Officer Barber.

11 Q     Scott Barber?

12        Then what did you do next?

13 A     Once we had the vessel, we made sure it was seaworthy, we

14 passed up the information to Petty Officer Raven and then she

15 went up the chain of command and then that's where I started to

16 do my Alpha Report and ask the questions on there.

17 Q     Did you happen to notice whether Officer Perry was holding

18 a pistol?

19 A     Yes, sir.  She was still on the British small boat,

20 providing cover for us to get on, and then once I holstered and

21 Petty Officer Barber, she did as well.

22        THE COURT:  Well, I'm confused.  So you holstered and

23 then got on the other vessel.

24        THE WITNESS:  Yes, Your Honor.

25        THE COURT:  Was Officer Perry still holding her

1  weapon when you got on the vessel?

2        THE WITNESS:  Yes, she was, Your Honor.

3        THE COURT:  And so she didn't holster when you

4  holstered, she holstered later?

5        THE WITNESS:  Yes, Your Honor.

6        THE COURT:  How long was she holding her weapon after

7  you got on the vessel?

8        THE WITNESS:  Once we completed, um, the -- we pulled

9  the kill switch and then we did our initial safety sweep,

10  that's when she holstered her pistol.

11        THE COURT:  How long?

12        THE WITNESS:  Say two, three minutes.

13        THE COURT:  Continue.

14        MR. BOGGS:  Thank you.

15  BY MR. BOGGS:

16  Q    Were the persons onboard the boat -- how many were there?

17  A    There were three persons on board.

18  Q    Okay.  Were they confined in any way, other than,

19  you know, the fact that they're on a boat?

20  A    I don't believe they were confined.  We just asked them to

21  move to the front of the bow of the boat.

22  Q    Were they handcuffed?  Were they tied up?

23  A    No handcuffs.  No tied up.

24  Q    Were they made to lie down?

25  A    No, sir.

1   Q    Were they allowed to sit?

2   A    Yes, sir.

3   Q    You mentioned your concerns about safety a few moments

4   ago.  What are your other concerns when you're boarding a

5   vessel?

6              THE COURT:  In this instance or in general?

7              MR. BOGGS:  In general.

8   A    So big safety concerns.  Again, when we're on these small

9   vessels one thing is vessel stability.  Sometimes they have

10  excess of fuel, fuel, and it's not distributed right on the

11  vessel.  There also can be unknown weapons, either -- if it be

12  a knife or a gun, underneath one of the little seats, so that

13  comes into officer safety.

14  Q    In this particular case, did you have any concerns other

15  than what you've already mentioned, getting the engine

16  stopped --

17  A    No, we had no other concerns.

18  Q    -- and safety that caused you to draw your weapon?

19  A    Just in the beginning we did, but after we completed our

20  initial safety sweep we didn't see anything else that could

21  cause harm to us, the boarding team.

22  Q    I asked you earlier about right of visit boarding and

23  law enforcement boarding.  Had you -- do you need -- I might

24  have asked this already.  If I did, I apologize.

25            Do you need authorization to do either of those?

1    A    We already have the authority to conduct right of visit

2    boarding, but that's all we can do, is just determine their

3    nationality, we'll send that up to the chain of command, and

4    then that's -- we'll get the okay or not okay to conduct a

5    law enforcement boarding.

6    Q    When did you receive the right of visit boarding

7    authorization in this case?  Was it before you boarded?

8    A    Yes.

9    Q    Do you remember how long before you boarded, ballpark

10   figure?

11   A    When we got the right of visit authority?

12   Q    Yes.

13   A    It was probably three, four hours we waited until we got

14   the actual okay to do the boarding.

15   Q    So just to be clear, did you have right of visit boarding

16   authority before you jumped onto the boat?

17   A    I don't understand the question.

18   Q    Okay.  There's two different types of --

19          THE COURT:  Just ask the question again, not explain

20   the answer.

21   Q    You stated that you and --

22          THE COURT:  Barber.

23   Q    -- Officer Barber boarded the boat and hit the kill

24   switch.  Did you already have right of visit boarding authority

25   at that point?

1  A    Yes.

2  Q    If you recall, when during the sequence of events that

3  you've described here today that you were given through the

4  chain of command that right of visit boarding authority?

5  A    So we jumped on to make sure the vessel was positively

6  controlled under us, and then we boarded it for that same

7  instance and conducted the initial safety sweep.

8  Q    Okay.  Not my question, and I'll try to --

9        THE COURT:  Well, I think the question creates a

10  confusion, because I think this witness thinks boarding and

11  jumping on and kill switch are different things, it appears to

12  be.

13  Q    Let me direct the questions to just this.

14        The authorization, the right of visit authorization,

15  okay, you stated that you had it before anybody went on the

16  boat.  Is that right?  Anybody, you, Officer Barber, did you

17  have -- if you had not needed to do the kill switch, did you

18  already have right of visit authority?

19  A    No.

20  Q    Okay.  When did you receive right of visit authorization?

21  That -- does that start the questioning?

22  A    Yeah.  Um, so we -- the way I think of it, we boarded the

23  vessel but we didn't commence to do a boarding, so we got

24  on board, did those two things, and then set -- sat and waited

25  to conduct the boarding.

1   Q    Okay.  So that helps me ask the right question.

2        So when you jumped on the vessel to hit the kill

3   switch, that in your mind, as a Coast Guard officer, that's not

4   a boarding?

5   A    No.

6   Q    A boarding is something that's legally authorized.  Okay.

7        THE COURT:  Yes, ma'am?

8        MS. SWEENEY:  Objection, calls for leading, but the

9   answer is in.

10  BY MR. BOGGS:

11  Q    And you shook your head, and you need to say it out loud.

12  A    No, there's two different things.

13  Q    All right.  So I have perhaps caused confusion.  The Court

14  has noted --

15       THE COURT:  Well, he answered this question very

16  early on, he said once they moved to the front of the boat,

17  I holstered my pistol, as well as Petty Officer Barber, and we

18  jumped over and he pulled the kill switch for the engine, and

19  then we did a quick initial safety sweep to make sure the

20  vessel was seaworthy for us and the crew members.  Once we had

21  the vessel, we made sure it was -- once we had the vessel, we

22  made sure it was seaworthy, we passed up the information to

23  Petty Officer -- I think he means Perry, and then she went up

24  the chain of command, and that's where I started to do my Alpha

25  Report.

1          So you didn't get the permission to board, the

2     initial, until after you did the kill switch; is that accurate?

3          THE WITNESS:  Yes, Your Honor.

4          MR. BOGGS:  Thank you, Your Honor.  I was trying to

5     clear up a confusion that didn't exist in the Court's mind, so

6     I was pursuing something that didn't need to be pursued.

7     BY MR. BOGGS:

8     Q    Let me turn then to the Alpha Report that you just

9     mentioned.

10         That is -- is that, rather, the set of questions you

11    talked about earlier?

12    A    Yes, sir.

13    Q    And do you recall what some of those questions are?

14    A    Yes, sir.  A few of them are the vessel's name, if they

15    have a flag or some type of nationality flown on the vessel,

16    last port of call, next port of call, the purpose of voyage and

17    a few RS indicators to pass up.

18         THE COURT:  What does RS mean?

19         THE WITNESS:  Reasonable suspicion, Your Honor.

20    BY MR. BOGGS:

21    Q    In this case was there an answer that was significant that

22    you passed up the chain of command regarding the purpose of the

23    voyage?

24    A    Yes, sir.  I asked the purpose of the voyage and they said

25    they were trafficking or smuggling.

1          THE COURT:  When you say "they said," I need you to

2     be specific.  Who said what?

3          THE WITNESS:  It was the -- this man here, Varga,

4     said smuggling.

5     BY MR. BOGGS:

6     Q    Did all of the persons on board answer these questions?

7     A    So when I --

8          THE COURT:  Yes or no.

9     A    No.

10    Q    How did it unfold in this particular case, when you were

11    asking the questions?

12    A    So it unfolded by me asking the crew -- they could all

13    hear me, and I asked them -- I started asking them one-by-one

14    these questions, and usually no one talks, so I keep going down

15    the line items.  Once someone gets comfortable to talk to me,

16    then I treat that person as a master and they give me all the

17    information I need to fill out my report.

18    Q    Did that happen in this case?

19    A    Yes, sir.

20    Q    Who was the person who started answering questions?

21    A    Mr. Varga.

22    Q    And were you asking these questions in Spanish?

23    A    Yes, sir.

24    Q    Did you repeat them for Officer Perry in English?

25    A    No, sir.

1  Q    Did you pass the information along?

2  A    Yes, sir.

3  Q    At what point did you do that?

4  A    Once I was done with the report.

5  Q    Okay.  So at the end of the report, did you pass the

6  information along to Officer Perry?

7  A    Yes, sir.

8  Q    Did you do that in English?

9  A    No, sir.  The form is in English.

10 Q    No.  To Officer Perry.  Did you do -- did you give her the

11 answers in English?

12 A    Oh.  Yes, sir.

13 Q    Back to --

14       THE COURT:  Well, let's go back to that, before you

15 leave, so I don't forget to ask.

16       So when you're asking the people the questions in

17 Spanish, you're not repeating the questions to Officer Perry in

18 English?

19       THE WITNESS:  No, Your Honor.

20       THE COURT:  And then when they give you the answers

21 in Spanish, do you repeat them aloud to Perry in English or

22 do you write them on a piece of paper?

23       THE WITNESS:  I write them down, Your Honor.

24       THE COURT:  Do you yell over the bow of the boat,

25 "He said 'We're smuggling,'" or do you write them on a piece of

 1  paper?

 2          THE WITNESS:  I wrote them down, Your Honor.

 3          THE COURT:  Can she hear you talking to these people?

 4          THE WITNESS:  She can, Your Honor.

 5          THE COURT:  But you're always speaking in Spanish

 6  entirely?

 7          THE WITNESS:  Yes, Your Honor.

 8          THE COURT:  Can you mimic for me to counsel there, in

 9  the voice you were using when you asked "What is the purpose of

10  your voyage," as if you were on the boat right now, in the same

11  tone of voice, height of voice, everything to counsel, in

12  Spanish.

13          THE WITNESS:  So the way I asked him was -- *(witness*

14  *speaking in Spanish.)*

15          THE COURT:  You said that in that low slight kind

16  voice, or did you say it loud enough for him to hear you?

17  I'm assuming they didn't have a mic on the boat.

18          THE WITNESS:  No, Your Honor.  We were about three,

19  four feet away from each other, and that's exactly how I said

20  it.

21          THE COURT:  So you were not ten feet away?  You

22  believe you were three to four feet away?

23          THE WITNESS:  Yes, Your Honor.

24          THE COURT:  So in this courtroom, because people

25  aren't really good at distances, from where you're sitting

1    right now, where would Mr. Varga have been sitting, between you

2    and counsel?

3                    THE WITNESS:  Yes, Your Honor.

4                    THE COURT:  And all three of the guys were sort of

5    lined up right there?

6                    THE WITNESS:  They were all sitting down in the

7    little bench up forward, Your Honor.

8                    THE COURT:  And you were standing?

9                    THE WITNESS:  No, I was sitting, Your Honor.

10                   THE COURT:  Sitting on what?

11                   THE WITNESS:  I can't remember if I was sitting on

12   one of the gas tanks or I was sitting on one of the benches.

13                   THE COURT:  And you were just having a conversation

14   like you and I are having right now?

15                   THE WITNESS:  Yes, Your Honor.

16                   THE COURT:  And you asked this question of each of

17   them until someone gave you an answer?

18                   THE WITNESS:  Yes, Your Honor.

19                   THE COURT:  And when that person started talking,

20   that's the person you continued to talk to?

21                   THE WITNESS:  Yes, Your Honor.

22                   THE COURT:  And you treated him as a captain?

23                   THE WITNESS:  Yes, Your Honor.

24                   THE COURT:  Did he tell you he was the captain in

25   this instance?

 1          THE WITNESS:  No, he did not.

 2          THE COURT:  And was there no wind and rain and boats

 3    clanging together and airplanes overhead?

 4          THE WITNESS:  It sounds a little weird, but I'm able

 5    to have a --

 6          THE COURT:  Yes or no?  Was there wind, rain, boats

 7    clanging and airplanes --

 8          THE WITNESS:  Yes, there was, Your Honor.

 9          THE COURT:  Okay.  But you were able to talk to them

10    face-to-face because you were within three feet of them?

11          THE WITNESS:  Yes, Your Honor.

12          THE COURT:  And Officer Perry did not have a weapon

13    drawn on them when you were three feet from these strangers on

14    this boat asking these questions?

15          THE WITNESS:  No, Your Honor.

16          THE COURT:  Counsel, continue.

17          MR. BOGGS:  Thank you.

18    BY MR. BOGGS:

19    Q    I would like to show you a couple of documents.

20          MR. BOGGS:  Your Honor, I apologize.  When I filed my

21    witness list, I wish I had followed defense counsel's witness

22    list -- exhibit list.  We have the same exhibit, but for some

23    reason I don't think there's --

24          THE COURT:  Is there a question in there somewhere?

25          MR. BOGGS:  Yes.  I put -- I put them in the reverse

 1  order.  I don't believe that --

 2          THE COURT:  You're first up.  We'll use your order.

 3  BY MR. BOGGS:

 4  Q    I'll show you first what I marked as Government Exhibit 1,

 5  which the defense marked as 2, and ask you to take a look at

 6  that.

 7          Do you recognize that item?

 8  A    Yes, sir.

 9  Q    What is it?

10  A    This is our -- part of our law enforcement case package.

11  Q    Have you seen it before?

12  A    Yes, sir.

13  Q    Have you reviewed it generally?

14  A    Yes, sir.

15  Q    Does it recount details of this particular boarding?

16  A    Yes, sir.

17  Q    Did you author this particular checklist, case package

18  checklist?

19  A    Yes, sir.

20  Q    Did you -- or were you the person who typed in all the

21  items?

22  A    No.

23  Q    So were there other people involved in typing in items on

24  this particular case package checklist?

25  A    Yes, sir.

1   Q    Did some of the information that's put in this report come

2   from you?

3   A    Yes, sir.

4   Q    Is there other information in this report that came from

5   other sources?

6   A    Yes, sir.

7         MR. BOGGS:  Your Honor, the United States would move

8   for admission into evidence of Government's Exhibit 1.  The

9   Defense had it as number 2.

10        THE COURT:  I don't need to know what they had it as,

11  just call it yours.

12        MR. BOGGS:  Government's Exhibit 1.

13        THE COURT:  Any objection?

14        MS. SWEENEY:  No, Your Honor.

15        THE COURT:  They'll be received.

16  BY MR. BOGGS:

17  Q    I just want to ask you a quick question about on the first

18  page of Government's Exhibit 1, in the middle, does it recount

19  "smuggling, as claimed by the master"?

20  A    Yes, sir.

21  Q    Is that information that came from you, you were the

22  originator of that information?

23  A    Yes, sir.

24  Q    Okay.  How does it get in this checklist?

25  A    The Alpha Report reflects information off this checklist.

1            THE COURT:  Do you have a copy for the Court of this

2     document?

3            MR. BOGGS:  Yes, Your Honor.  I'm sorry.

4     I definitely -- I do.  It's also been admitted in previous

5     hearings and defense counsel attached it to their exhibit list

6     yesterday.

7            THE COURT:  Thank you.

8     BY MR. BOGGS:

9     Q    So the way that information -- this information in

10    particular, "smuggling, as claimed by the master," gets into

11    the report, is that from your passing it up the chain?

12    A    Yes, sir.

13           THE COURT:  Is this a preprinted report with a

14    checkmark, or is this a word that you typed in here?

15           THE WITNESS:  Your Honor, on the preboarding

16    questions?

17           THE COURT:  Yes.

18           THE WITNESS:  That "smuggling, as claimed by the

19    master," that's typed in.

20           THE COURT:  By you or by someone else?

21           THE WITNESS:  By someone else, Your Honor.

22           THE COURT:  Based on what you tell them in your

23    paper?

24           THE WITNESS:  Yes, Your Honor.

25           THE COURT:  Counsel, you can continue.

1       MR. BOGGS:  Thank you.

2  BY MR. BOGGS:

3  Q    And I'd like to show you Government's Exhibit 2 for

4  identification.

5            I have a copy for the Court.

6            I'll ask you the same questions.

7            Do you recognize that particular item?

8  A    Yes, sir.

9  Q    How do you recognize it?

10 A    This was the Alpha Report that I filled out in my grease

11 pencil.

12 Q    And similarly with the case package and the questions that

13 I and the Court just asked you, are you the person that typed

14 these answers in?

15 A    No, sir.

16 Q    Are these, rather, the answers that you recounted up the

17 chain on the 2nd of September, 2020 and then they were rendered

18 into this typewritten report?

19 A    Yes, sir.

20 Q    Okay.  Which question is it -- well, Your Honor, the

21 United States moves for admission into evidence Government's

22 Exhibit Number 2, the Consolidated EPAC Boarding Alpha Report.

23           MS. SWEENEY:  No objection.

24           THE COURT:  It will be received.

25           MR. BOGGS:  Thank you.

1   BY MR. BOGGS:

2   Q    Now, which question on this Government's Exhibit Number 2,

3   Consolidated EPAC Boarding Alpha Report, is the one that

4   related to Mr. Varga's statement about the purpose of the

5   voyage?

6   A    Line 18.

7   Q    Do you know what the answers to these questions are used

8   for after you pass them up the chain?

9   A    To my understanding, they are used to get reasonable

10  suspicion and to give us authority to give probable cause to

11  board the vessel and conduct the law enforcement boarding.

12  Q    Do the questions -- are they used to help determine a

13  registry or nationality of the vehicle -- or the vessel?

14  A    Yes, sir.

15  Q    And how would these questions assist in that effort?

16  A    A few of the questions asked, the nationality of the

17  vessel and other persons, so we would reach out to that nation

18  and see if that nation claims the vessel or persons.

19  Q    Would a nation contacted be able to cross-reference any of

20  this information?

21  A    The only thing they would be able to do --

22          MS. SWEENEY:  Objection.  Calls for speculation.

23          THE COURT:  Sustained.

24  BY MR. BOGGS:

25  Q    Are you aware of whether or not vessels you encounter in

1   international waters have requirements in their host countries

2   before they leave for international waters?

3   A    Yes.

4   Q    What types of requirements are they?

5   A    Certain countries require documentation called the zarpe.

6   Q    What countries, if you know?

7   A    South America requires them to have zarpes.

8   Q    Does Colombia?

9   A    Yes, that's one of them.

10  Q    Does the Dominican Republic, if you know?

11  A    Yes, sir.

12  Q    And what's a zarpe?

13  A    A zarpe is a document they use, it outlines, A, their

14  leaving the port, the day that they're retrieving -- they're

15  coming back to -- back home, the purpose of their voyage, the

16  persons on board, their full name, with their cédula number,

17  and a few other things I can't recall.

18  Q    So the purpose of the voyage is a standard question that's

19  answered -- asked of legitimate mariners leaving countries like

20  the Dominican Republic and Colombia --

21  A    Yes, sir.

22  Q    -- to go to international waters?

23  A    Yes, sir.

24  Q    You mentioned earlier that Mr. Varga started talking and

25  so you treated him as the master.  What were the other crew

1  members doing?

2          MS. SWEENEY:  Objection.  I think that

3  mischaracterizes the evidence.  I don't believe --

4          THE COURT:  Overruled.

5          MR. BOGGS:  Okay.  Thank you, Your Honor.

6  BY MR. BOGGS:

7  Q    What were the other crew members doing while Mr. Varga

8  talked?

9  A    They just sat there in silence.

10  Q    How long were you on the vessel with the crew?

11          THE COURT:  The entire time?

12  Q    Yes, the entire time before you left.

13  A    Approximately four or five hours.

14  Q    About -- from the beginning to -- at some point, based on

15  the questions that you mentioned you pass along from the

16  Alpha Report, did you receive authorization for a full

17  law enforcement boarding?

18  A    Yes, sir.

19  Q    Approximately how long into that four to five hours did

20  you receive that authorization?

21  A    Approximately two, three hours into it.

22  Q    After you received that authorization for law enforcement

23  boarding, full law enforcement boarding, did you then receive

24  authorization to treat the persons on board as detainees at

25  some point?

1    A    Yes, sir.

2    Q    Do you remember when in the whole process that took --

3    that happened?  And just a ballpark figure, not trying to trick

4    you or anything.

5    A    Maybe around the fourth hour.

6    Q    But it was after the full law enforcement boarding?

7    A    Yes, sir.

8    Q    During this four, five hour period, were the persons

9    on board, the passengers of the vessel, allowed to go to the

10   bathroom?

11   A    Yes, sir.

12   Q    Did any of them express any physical problems, any medical

13   problems?

14   A    Not that we could assess at the moment, but one of them

15   did say that their -- their side or their ribs hurt.

16   Q    I take it, since you said, you know, that when you first

17   got on the boat it was getting around dusk, that this carried

18   on into the dark hours?

19   A    Yes, sir.

20   Q    Did any of the people on the boat go to sleep?

21   A    I don't recall, sir.

22   Q    Other than -- well, let me ask you to just go through a

23   couple of the -- you talked about some of the questions, the

24   names, the description of the boat, and I asked you

25   specifically --

1      THE COURT:  Do you have a question?

2      MR. BOGGS:  Yes.

3 Q    What are some of the other questions that I haven't asked

4 you about that you asked the detain -- the -- not the

5 detainees, the persons on board the vessel?

6 A    I only asked them questions that's on the Alpha Report.

7 Q    And you didn't -- did you -- you didn't ad lib or,

8 you know, do any questions of your own?

9 A    No, sir.

10 Q    Okay.  How would you describe the demeanor of the persons

11 on board?

12 A    The demeanor of the crew seemed very down.

13 Q    How would you -- let me ask you about --

14      THE COURT:  Counsel, you're about out of time for

15 this witness.  Do you have some pertinent questions?

16      MR. BOGGS:  I'll just end it there, Your Honor.

17      THE COURT:  All right.

18 **CROSS-EXAMINATION OF BOARDING OFFICER MARCOS VILLASEÑOR**

19 **BY MS. SWEENEY:**

20 Q    Sir, you said you were given a briefing prior to leaving

21 the ARGAS?

22 A    Yes, ma'am.

23 Q    Who gave that briefing and what were you told?

24 A    The briefing was given by the CO of the ARGAS and my

25 Officer In Charge.

1   Q    And what were you told?

2   A    We have a suspected go-fast vessel that is traveling at a

3   high rate of speed and has some sort of contraband on board.

4   Q    When you say "a suspected go-fast vessel," does that mean

5   it was a suspected drug boat?

6   A    Yes, ma'am.

7   Q    So you had a suspected drug boat going at a high rate of

8   speed, and what else?

9   A    It had suspected contraband on board.

10  Q    And had suspected contraband, which means drugs on board?

11  A    Yes, ma'am.

12  Q    So you left the ARGAS with a reasonable suspicion that

13  this was a drug smuggling boat?

14  A    Yes, ma'am.

15  Q    This exhibit, Government Number 2, the Alpha Report, is it

16  this exact format when you do your questioning?

17  A    Yes, ma'am.

18  Q    So there's a form you have where you wrote in information,

19  correct?

20  A    Yes, ma'am.

21  Q    Where is that?

22  A    That is on our BQ -- our Boarding Officer kit back at the

23  unit.

24  Q    Where is that now?

25  A    It's back at the unit.

1   Q    All right.  Did you submit it to anyone to be put in the

2   case package?

3   A    No, ma'am.

4   Q    Why not?

5   A    The paper I use, that's laminated and it's written in

6   grease pencil, and all the information that's put on here by me

7   gets transmitted up the chain of command, and we don't put the

8   laminated sheet inside the case package.

9   Q    So your written laminated sheet no longer exists?

10  A    No, ma'am.

11  Q    It does not exist?

12  A    No, ma'am.

13           THE COURT:  So you just wipe it off after you submit

14  it up the chain?

15           THE WITNESS:  Yes, Your Honor.

16           THE COURT:  Do you hand it to someone or do you scan

17  it in?

18           THE WITNESS:  We don't scan in the laminated sheet at

19  all.

20           THE COURT:  You just hand it to someone?

21           THE WITNESS:  I hand it over to the person that's

22  doing the coms, so it's Petty Officer Raven, or Perry, and she

23  sends all the information up and we erase all the information

24  for the next boarding.

25           THE COURT:  It's like a white board, basically?

1           THE WITNESS:  Yes, Your Honor.

2           THE COURT:  I'm sorry.  Before we get too far afield,

3    can you repeat the statement that you said a few minutes ago in

4    Spanish so that I can have the interpreter translate it in

5    English so I can put it on the record?

6           What was the question you said you would have asked

7    him about when you asked that question a second ago?

8           THE WITNESS:  I had asked them -- *(Witness speaking*

9    *in Spanish.)*

10          THE COURT:  Can you repeat that?

11          INTERPRETER:  Yes, Your Honor.

12          "I asked him what were you all doing."

13          THE COURT:  All right.  Go ahead, Ms. Sweeney.

14   BY MS. SWEENEY:

15   Q    You said you've been trained in the use of force?

16   A    Yes, ma'am.

17   Q    And you have a knowledge then of the use of force?

18   A    Yes, ma'am.

19   Q    As you were approaching this target of interest boat, was

20   it still raining?

21   A    It was not raining, ma'am.

22   Q    When you approached it.

23   A    I believe it was not raining.

24   Q    Okay.  Yes or no, when you approached it, was it raining?

25   A    No, ma'am.

1          THE COURT:  Had it been raining?

2          THE WITNESS:  Yes, Your Honor.

3          THE COURT:  At what point did it stop raining?

4          THE WITNESS:  Before we got alongside the target of

5   interest vessel.

6          THE COURT:  Counsel, you can continue.

7   BY MS. SWEENEY:

8   Q    Your guns were pulled or drawn prior to getting right next

9   to the boat, the target of interest boat, correct?

10  A    Yes, ma'am.

11  Q    And they were pointed at the people?

12  A    Yes, ma'am.

13  Q    And they were pointed at the people as a way to ensure

14  compliance as well, right?

15  A    Yes, ma'am.

16  Q    And you ordered them to the front of the boat?

17  A    Yes, ma'am.

18  Q    You didn't ask them?

19  A    No, ma'am.

20  Q    What were you wearing?

21  A    We wear a green uniform, it's called -- the material is

22  like MultiCam, I believe, and it's long sleeves, plate carrier,

23  law enforcement belt with our pistol, and the same pants and

24  boots.

25  Q    And, I'm sorry, you said plate carrier?

1  A    Yes, ma'am.

2  Q    What is that?

3  A    Um, it's –– it's a vest that carries thick plates to stop

4  a rifle round.

5  Q    Does it –– do you have any words or anything printed on

6  the front of your uniform?

7  A    We carry patches on both sides, one is the national, and

8  the other is the Coast Guard, with the unit, unit logo.

9  Q    Okay.  So the pistols are drawn, you order them to the

10  front of the boat.  Is this when you get on the boat?

11  A    Yes, ma'am.

12  Q    And who told you you could get on that boat?

13  A    No one, ma'am.

14  Q    No one told you, you just did it?

15  A    I got on there to make sure the vessel was positively

16  controlled under us.

17  Q    I know.  Who told you to do that?

18  A    From my training and experience to do these boardings,

19  I got on board to make sure the vessel was under control and

20  seaworthy.

21  Q    All right.  So let me get it clear.

22        THE COURT:  He's already answered your question.  Do

23  you have another question?

24  Q    Who told Officer Barber to get on the boat with you?

25  A    He followed me.

1  Q    And you stayed on the boat the entire time, correct?

2  A    Yes, ma'am.

3  Q    All four hours?

4  A    Yes, ma'am.

5  Q    Sitting within three feet of the three men on board?

6  A    We were sitting in the sterns probably a few feet away,

7  but we were still on the boat with them.

8  Q    And Officer Barber stayed on the boat the whole time as

9  well?

10  A    Yes, ma'am.

11  Q    And there is no audio of the questions you asked and the

12  answers you received?

13  A    No, ma'am.

14  Q    Did you actually see someone jettison bales or did someone

15  tell you?

16  A    I saw someone, ma'am.

17  Q    I'm sorry, sir?

18  A    I saw someone.

19  Q    So you did not start asking any questions until you had

20  physical control of the vessel?

21  A    Yes, ma'am.

22  Q    That means they couldn't leave?

23  A    No, ma'am.

24  Q    And if they had asked, would you have said no?

25  A    Correct.

1  Q    And the engine was turned off?

2  A    Correct.

3  Q    You never told -- did you ever tell Mr. Varga or any of

4  the other people on board why they were stopped?

5  A    Yes.

6  Q    And does that appear on the Alpha list?

7  A    No, ma'am.

8  Q    So what did you tell them?

9  A    I told them they were stopped because they were in a known

10 drug trafficking area and we retrieved a bale that they tossed.

11 Q    So you were interrogating them about criminal behavior?

12 A    No, ma'am.

13 Q    Okay.  Throwing the bale that you said you believed was

14 contraband and they were in a drug smuggling area and that's

15 why they were stopped, you were asking about criminal behavior?

16 A    I wasn't asking them.  That was the reason why we were

17 there.

18 Q    Because of the suspicious -- because you suspected them of

19 criminal behavior?

20 A    Yes, ma'am.

21       MS. SWEENEY:  Your Honor, may I confer for a moment?

22       THE COURT:  Yes.

23 BY MS. SWEENEY:

24 Q    Sir, did the rain stop while you were approaching the side

25 of the target vessel?

1  A    Yes, ma'am.

2  Q    How far were you from the target vessel when the rain

3  stopped?

4  A    I can't recall, ma'am.

5  Q    A few feet?  I know you don't use probably the term

6  "feet."  A few feet?

7  A    Approximately maybe 20, 30 yards.

8  Q    Okay.  And did you -- other than climbing over into this

9  boat, did you take all your directions from Petty Officer Raven

10  Perry?

11  A    Yes.

12  Q    Because she's in charge of the operation?

13  A    Yes, ma'am.

14  Q    Did she tell you to climb over into that boat?

15  A    Yes, sir.

16  Q    Did she tell Officer Barber to climb over into that boat?

17  A    Yes, ma'am.

18        THE COURT:  Well, sir, you need to make up your mind.

19  Did she tell you to climb into the boat or did you climb into

20  the boat yourself?

21        THE WITNESS:  I apologize, Your Honor.  She told us

22  to climb over the boat.

23        THE COURT:  So you didn't just do it on your own, you

24  did it on directions of your supervisor.

25        THE WITNESS:  Yes, ma'am.

1          THE COURT:  So why did you give a different answer a

2   minute ago?

3          THE WITNESS:  Honestly, it was just jumbled in my

4   head.

5          THE COURT:  Counsel, you may continue.

6   BY MS. SWEENEY:

7   Q    What word in Spanish did Mr. Varga use for the word

8   smuggling?

9   A    Traficando.

10  Q    Can you spell that, please, for our record.

11  A    In Spanish?

12  Q    Yes.

13  A    T-R-A-F-I-C-A-N-D-O.

14  Q    At no time did you give any *Miranda* -- what we -- you're

15  familiar with *Miranda* rights, correct?

16  A    Yes, ma'am.

17  Q    And at no time did you give any *Miranda* rights to

18  Mr. Varga or anyone on the boat?

19  A    No, ma'am.

20  Q    What else did you do on this case?  When you were done

21  questioning Mr. Varga, what did you do?

22  A    We just waited until we got authority to do the actual

23  law enforcement boarding.

24  Q    Okay.  What else did you do on this case?

25  A    We did -- I did the at-sea accountability sketch.

1  Q    And what is that?

2  A    We take measurements of the vessel so we can put it inside

3  the case package how the vessel looked and its dimensions.

4  Q    Do you remember how long you think it was?

5  A    That took about 45 minutes or so.

6  Q    Okay.  You don't know how long -- you don't recall how

7  long the vessel was?

8  A    About 45 feet.

9  Q    What else did you do?

10 A    We did that, we did ion scan swabs.

11 Q    And what were the results?

12 A    I don't recall.

13 Q    Would you have been the one responsible for recording the

14 ion scan results?

15 A    No, ma'am.

16 Q    Who would be?

17 A    That would have been someone back on the ARGAS.

18 Q    So you just tell -- how does that get back to the ARGAS?

19 A    So we will swab the vessel with plastic gloves with the

20 little litmus paper, take off the glove, put that glove in a

21 bag, and that bag would eventually go on the small boat or the

22 ARGAS and go back to ARGAS itself and we have a machine there

23 to do it.

24 Q    Do you remember who you gave the bag to?

25 A    Petty Officer Perry.

1    Q    Do you know what she did with it?

2    A    No, ma'am.

3              MS. SWEENEY:  I have no other questions, Your Honor.

4              THE COURT:  Counsel?

5              MR. BOGGS:  Nothing further, Your Honor.

6              THE COURT:  In your statement -- it's Villaseñor,

7    right?

8              THE WITNESS:  Yes, Your Honor.

9              THE COURT:  In your statement you said:  I finished

10   filling out the Alpha Report and master Bernardo Varga verbally

11   claimed they were smuggling drugs.

12             That's not consistent, in my mind, with what you just

13   said about when he told you that.  You told both lawyers that

14   you asked him the purpose of the voyage and he told you

15   smuggling and you wrote that down.  So which is it?  Did you

16   finish filling out the report and he just volunteered they were

17   smuggling, or did you ask them if -- ask him the purpose and he

18   told you smuggling?

19             THE WITNESS:  He asked me the purpose and that's what

20   I put down, Your Honor.

21             THE COURT:  You asked him the purpose?

22             THE WITNESS: Yes, ma'am.

23             THE COURT:  You said, "What were you doing out here?"

24   And he said, "smuggling"?

25             THE WITNESS:  Yes, ma'am.

1        THE COURT:  Was that before or after you told him all

2   this information about finding them in a drug area and so

3   forth?

4        THE WITNESS:  After.

5        THE COURT:  Those statements aren't on the Alpha

6   Report, about what you had observed about the vessel and such.

7   Where did that come from?

8        THE WITNESS:  That was from our brief, Your Honor.

9        THE COURT:  From your brief from the boat back before

10  you got on the small boat?

11        THE WITNESS:  Yes, Your Honor.

12        THE COURT:  So you gathered the three guys at the top

13  of the boat and then you say, hi, guys, I'm here, I'm on this

14  boat, and let me tell you what we know about what's going on

15  here?

16        THE WITNESS:  Yes, Your Honor.

17        THE COURT:  And then what do you tell them?

18        THE WITNESS:  I need them to answer these questions

19  that I have on my report.

20        THE COURT:  No, but what do you tell them about what

21  you know they are doing?

22        THE WITNESS:  I just told them that they were in a

23  suspected drug trafficking area and that we recovered a bale.

24        THE COURT:  And do you say something to the effect of

25  you need to come clean about this and be honest with me and

1  answer these questions, or do you just say that as a general

2  preface for your inquiry?

3            THE WITNESS:  No, I did not say that, Your Honor.

4            THE COURT:  Why are you talking about the briefing to

5  these people in connection with -- what do you call this first

6  boarding?

7            THE WITNESS:  The right of visit.

8            THE COURT:  Yes.  Why are you talking about the whole

9  drug smuggling venture in connection with the right of visit

10 Alpha Report inquiry?

11           THE WITNESS:  I don't -- I don't know, Your Honor.

12           THE COURT:  Isn't that more the law enforcement part?

13           THE WITNESS:  Yes, Your Honor.

14           THE COURT:  And are those standard questions you ask

15 of all boats that you board for the purpose of doing the right

16 of visit inquiry?

17           THE WITNESS:  Are these all the questions I ask?

18           THE COURT:  No.  This whole business about telling

19 them you're in a drug smuggling area and you had a bale of

20 cocaine just fall off the back of your boat and we know what

21 you guys are doing out here, do you do that with every boat you

22 encounter or do you ask the Alpha Report questions?

23           MR. BOGGS:  Your Honor, he didn't say that.  That's

24 not what he said.  That's not fair.

25           THE COURT:  Sir?

1          THE WITNESS:  Well, that's not what I said.  That's
2     not what I normally say, Your Honor.
3          THE COURT:  So why did you say anything like that in
4     this scenario?
5          THE WITNESS:  I don't know, Your Honor.
6          THE COURT:  Was there a lightning storm that night?
7          THE WITNESS:  Yes, Your Honor.
8          THE COURT:  When did that happen?
9          THE WITNESS:  The lightning storm started to take
10    place once we got law enforcement authority to board the vessel
11    and conduct our ASA sketch and all that, that's when it started
12    to hit.
13         THE COURT:  This is after the law enforcement
14    boarding had been authorized?
15         THE WITNESS:  Yes, Your Honor.
16         THE COURT:  Why did it take so long for you to get
17    authority to treat them as detainees if you already knew that
18    they were drug smuggling, you already knew they were in a
19    drug smuggling area, you already knew that they had thrown a
20    bale of cocaine off the back of the boat, and you'd already
21    done the ion scanning, why did it take to the end of the
22    four hours to treat them as detainees?
23         THE WITNESS:  Because of the nationality they gave
24    us, we would have to reach back to that nation and give them
25    the opportunity for them to claim the vessel and the persons.

1          THE COURT:  And so it's your understanding that you

2     didn't get word back from the DR until four hours later, almost

3     at the end of the law enforcement boarding?

4          THE WITNESS:  Yes, Your Honor.

5          THE COURT:  Who gives you permission -- so you don't

6     have to have the nation's permission for the law enforcement

7     part of the action?  I thought that's why it took two hours to

8     get that.

9          THE WITNESS:  It takes a few hours, Your Honor, to

10    send all this paperwork up to that nation, and then once the

11    nation either claims them or if they don't, they get treated

12    without nationality and under our jurisdiction.

13         THE COURT:  But I thought that's what took the

14    two hours to get, the authority to board for law enforcement

15    purposes?

16         THE WITNESS:  It does, Your Honor.

17         THE COURT:  So what took the additional two hours to

18    get the detainee authority?

19         THE WITNESS:  I believe they recovered the bale field

20    and they had to get two presumptive positives for narcotics.

21         THE COURT:  So this is the bale of cocaine you all

22    picked up on the small boat?

23         THE WITNESS:  No, Your Honor.

24         THE COURT:  This is a second bale that ARGAS had

25    dispatched someone to get?

1           THE WITNESS:  Yes, Your Honor.

2           THE COURT:  And that was being tested, and it's your

3   understanding that presumptive positives came back on that

4   second load of cocaine?

5           THE WITNESS:  Yes, Your Honor.

6           THE COURT:  And that's the point at which you

7   believed they gave permission to treat them as detainees?

8           THE WITNESS:  Yes, Your Honor.

9           THE COURT:  Is that in your report somewhere?

10          THE WITNESS:  No, Your Honor.

11          THE COURT:  How would anyone test your theory in that

12  respect?

13          THE WITNESS:  I'm -- since we were on the small boat,

14  if they -- the DTL, the Deployable Team Leader, if he tells me

15  to do something, we would do it, because I didn't personally

16  see the tests being done on the contraband, so once they got

17  those two positives, they relayed back that we could treat them

18  as detainees.

19          THE COURT:  And you think that came from a second

20  jettison field that -- not a second field, but a second pull

21  from that field?

22          THE WITNESS:  Yes, Your Honor, the one we marked.

23          THE COURT:  And my question is how do you know that

24  and where can Ms. Sweeney, for example, go to the file to

25  verify that?

1          MR. BOGGS:  Your Honor, I'm sorry, but many of your

2    questions, it's very difficult -- the United States wants to

3    show the utmost respect to the Court, but many of your

4    questions are questions that would be objectionable if they

5    were being asked by the defense attorney because they lead in

6    misleading directions.  This particular set of questions has

7    all to do with what the defendant -- the defendant -- the

8    witness may have heard from someone else.  The information has

9    been provided to Ms. Sweeney.  She can go to the report.  It's

10   just not fair for you to take over a defense role because it's

11   not possible for me to object to your questions the way that

12   I would object to objectionable questions by the defense.

13          THE COURT:  Is that an objection?

14          MR. BOGGS:  Yes, it's an objection.

15          THE COURT:  Overruled.  Overruled.

16          How would we be able to verify -- what prompted that

17   detainee report to come through to you?

18          THE WITNESS:  I don't understand the question,

19   Your Honor.

20          THE COURT:  Did a report come back to the boat saying

21   treat them as detainees?

22          THE WITNESS:  No, Your Honor.  So the substance gets

23   identified of what it is, then that information gets passed up

24   to something else high on the chain of command, and they give

25   the approval to treat them as detainees, which then my

1    Deployable Team Leader reaches out to us on the small boat to
2    treat them as such.
3              THE COURT:  So Ms. Perry would have told you, "we can
4    now treat them as detainees," or somebody above her or someone
5    else?
6              THE WITNESS:  It was her that told -- she got
7    information from the chain of command to treat them as
8    detainees.
9              THE COURT:  And did you then read them their rights
10   once you were told they could be treated as detainees?
11             THE WITNESS:  No, Your Honor.
12             THE COURT:  What happened then?
13             THE WITNESS:  We took them off their small boat, put
14   life jackets on them, gave them a frisk search, and brought
15   them back to ARGAS.
16             THE COURT:  And it would have been someone else's job
17   to read them their rights?
18             THE WITNESS:  Yes, Your Honor.
19             THE COURT:  And do you know if that was done?
20             THE WITNESS:  No, Your Honor.
21             THE COURT:  Did you question them at all after you
22   were told that they were to be treated as detainees, you
23   personally?
24             THE WITNESS:  No, Your Honor.
25             THE COURT:  You were the translator.

1           THE WITNESS:  Yes, Your Honor.

2           THE COURT:  Did you tell them in Spanish what they

3      were supposed to do at this point, that they were supposed to

4      be treated as detainees, and translating instructions from

5      someone else?

6           THE WITNESS:  I told them we were treating them as

7      detainees for the two presumptive positives of cocaine.

8           THE COURT:  So you did communicate these positives

9      that you had gotten word from Petty Officer Perry, you did tell

10     them that, the defendants?

11          THE WITNESS:  I believe so, when I was on the ARGAS.

12          THE COURT:  So you went back with them to the ARGAS?

13          THE WITNESS:  Yes, Your Honor.

14          THE COURT:  And that's the point at which you told

15     them, while they were back on the ARGAS?

16          THE WITNESS:  I told them -- yes, Your Honor.

17          THE COURT:  And were you then communicating directly

18     to them out of your own head or were you translating

19     information, serving only as a translator?

20          THE WITNESS:  After that, Your Honor, I was just the

21     translator.

22          THE COURT:  After that?  I mean, at that point where

23     you said you are being treated as a detainee because of the two

24     presumptive positives, were you translating or were you just

25     telling them facts in Spanish?

1    THE WITNESS:  I was translating.

2    THE COURT:  For whom?

3    THE WITNESS:  From the BO, Your Honor.

4    THE COURT:  What's the BO?

5    THE WITNESS:  The Boarding Officer, Petty Officer

6    Raven.

7    THE COURT:  So it's your memory that she told you,

8    "Can you please translate to these three guys the following,"

9    and you told them what she said?

10   THE WITNESS:  Yes, Your Honor.

11   THE COURT:  And at that point do you do anything else

12   with the three defendants?

13   THE WITNESS:  We just take them back to the ARGAS,

14   Your Honor.

15   THE COURT:  And then on the ARGAS do you do anything

16   else, you personally?

17   THE WITNESS:  We process them through our detainee

18   processing.

19   THE COURT:  Do you question them any further, you

20   personally?

21   THE DEFENDANT:  No, Your Honor.

22   THE COURT:  Do you translate for somebody else who is

23   questioning them at this point?

24   THE WITNESS:  No, Your Honor.

25   THE COURT:  And it takes about 15 days for you all to

1 get them to some place; is that right?

2        THE WITNESS:  I believe so, Your Honor.

3        THE COURT:  Were you with them the whole time?

4        THE WITNESS:  No, Your Honor.

5        THE COURT:  You go somewhere else on a different

6 boat?

7        THE WITNESS:  Yes, Your Honor.

8        THE COURT:  Any follow-up or clarifying, correcting

9 questions anyone wishes to ask of this witness, from the

10 Government?

11        MR. BOGGS:  No, Your Honor.

12        THE COURT:  From the defense?

13        MS. SWEENEY:  No, Your Honor.

14        THE COURT:  Any further witnesses for the Government?

15        MR. BOGGS:  No, Your Honor.

16        THE COURT:  Anyone wish to re-call Officer Raven?

17        MR. BOGGS:  No, Your Honor.

18        THE COURT:  Officer Perry.

19        MS. SWEENEY:  No, Your Honor.

20        THE COURT:  Thank you, sir.  You may step down.

21        THE WITNESS:  Thank you.

22        MR. BOGGS:  Your Honor, may we have a short break

23 before we argue?

24        THE COURT:  Yes, you may.  Like 15 minutes.

25        MR. BOGGS:  Thank you, Your Honor.

         THE COURT:  All right.  Court stands in recess for
15 minutes.

                    - - - - -

         (Recess at 4:11 p.m. until 4:32 p.m.)

                    - - - - -

         THE COURT:  Does someone have a videotape in the
courtroom?

         MR. BOGGS:  No, Your Honor.

         THE COURT:  Would you like to be heard, Counsel?

         MR. BOGGS:  Yes, Your Honor.

         With respect to that question, first of all,
Your Honor, both the Government and the defense have a video.
Neither of us deemed it probative enough to put it on our
exhibit list.  We'd be happy to provide it to the Court.
Perhaps the Court would disagree, but the video has been shared
in discovery and --

         THE COURT:  What does it show, Counsel?

         MR. BOGGS:  Hmmm?

         THE COURT:  What does it show?

         MR. BOGGS:  It shows a very grainy portion of when
the boats first came together.  I could make out extended arms.
It's from far away, or seems to be from far away.  The
testimony was that it was from the aircraft or something like
that.  And it stops before anybody boards the boat.  It just
didn't seem probative enough.  I considered, I talked with my

1  co-counsel about putting it on the exhibit list, considered it,

2  and decided, well, you know, we're going to have -- there's no

3  dispute that --

4        THE COURT:  How long does it last that they were

5  extending their arms, presumably aimed at the defendant's boat?

6        MR. BOGGS:  Well, Your Honor, now I feel the pain

7  that the witnesses feel in this case, because I didn't time it

8  when I watched it.

9        THE COURT:  Okay.  So then you can just produce it.

10        MR. BOGGS:  It was for a period of time.

11        THE COURT:  Just produce it and I'll take a look at

12  it.

13        Go ahead with your argument.

14        MR. BOGGS:  I'll return to that issue in a moment,

15  but to focus on the question here --

16        THE COURT:  Well, let me focus everybody's attention

17  to the thing that is most concerning to me about where we sit

18  now, having heard the testimony of witnesses, and that is this:

19  This boarding for the purpose of conducting the -- what is it,

20  the initial visit, what do they call it?

21        MR. BOGGS:  Right of visit.

22        THE COURT:  Right of visit.  Appears to me to have

23  occurred somewhat spontaneously and in the heat of the -- in

24  the heat of the sort of pursuit, with the two guys jumping off

25  their vessel onto the subject vessel and Officer Perry

providing what she said was cover for them while they secured
the vessel and killed the engine, and at that point I think the
record is a little unclear as to whether they had gotten any
kind of chain of command control.

Let's assume for the sake of argument that they had,
with the idea that maybe they didn't.  They're on the boat now
and Officer Villaseñor begins his inquiry of the subjects, who
are mustered, to use Officer Perry's language, to the front of
the vessel and told to sit, and then the questioning begins, in
loose use of the Alpha Report template, but prefaced by Officer
Villaseñor's statement to the defendants that we know that
you're in -- or we find that you're in drug smuggling
territory, and we know that -- and I'll go back to the precise
language.  My memory is we know that we found cocaine
jettisoned from your vessel, so --

MR. BOGGS:  The witness never said that.

THE COURT:  Well, let me find out what he said.

Can you pull the transcript where he says what came
off the vessel?

So what did you tell them?

I told them they were stopped because they were in a
known drug trafficking area and we retrieved a bale that they
tossed.

MR. BOGGS:  Right.  Could have been a bale of green
beans.

1        THE COURT:  Were you asking them about criminal

2  behavior?

3        I wasn't asking them.  That was the reason why we

4  were there, because of suspicion.

5        Because you had suspected them of criminal behavior?

6        Yes, ma'am.

7        So we're in a known trafficking area and we retrieved

8  a bale that they tossed.  That becomes a sort of backdrop for

9  what's supposed to be name, rank, serial number inquiry.

10       MR. BOGGS:  That's not correct, Your Honor.  The law

11  is quite clear that the Coast Guard can have dual purposes and

12  that these questions can serve dual purposes.  They're -- the

13  question is whether or not the environment is unduly coercive,

14  and the case law is very strong in the United States' favor

15  that these types of questions, this exact set of questions has

16  been approved in many cases.  The only case --

17       THE COURT:  This exact set of questions on the Alpha

18  Report, is the one you're referring to?

19       MR. BOGGS:  Yes.  These types of boarding questions.

20       THE COURT:  I would agree that the Alpha questions

21  are entirely appropriate and I would agree that if they had

22  asked the Alpha Report questions it would be entirely fine.

23       There is one case that causes me the most concern in

24  this regard, and that is this *United States versus Jayyousi*

25  case.

1          MR. BOGGS:  Which one?

2          THE COURT:  *Jayyousi,* 657 F.3d 1085, involving a

3    person who was questioned at an airport.

4          MR. BOGGS:  May I approach, Your Honor?

5          THE COURT:  Yes, sir.

6          MR. BOGGS:  I just want you to have a copy of those

7    cases.

8          THE COURT:  Are you listening to my question or are

9    you proffering cases?

10         MR. BOGGS:  Yes, I'm listening.  I'm sorry.

11         657 F.3d 1085.

12         There are some examples --

13         THE COURT:  Can I finish my question?

14         Okay.  So this guy apparently had cash over the

15   appropriate amount that you can possess coming through customs,

16   and the officers were interrogating him over a course of time,

17   asking him the types of appropriate questions I will just call

18   for purposes of short-term the Alpha Report type questions,

19   general questions.

20         Then it says:  Following another break, Agent Fincher

21   confronted Padilla with what the agent believed were Padilla's

22   intentions during his travels.  He stated that he believed

23   Padilla had been in Afghanistan, training with and meeting

24   Al-Qaeda officials, that these officials sent Padilla back to

25   Pakistan, where he later departed for another location to

commit an act of terrorism, that Padilla had been delayed and detailed in Karachi, and that Padilla then traveled from Zurich to Egypt and eventually to Chicago, where he intended to conduct surveillance for terrorist activity.

At that point Padilla stood up and announced that the interview was over and he wasn't going to talk any more.

That doesn't make sense, because there's a point at which he makes a disclosure.

The Court says: We disagree with the District Court that the earlier portions of the interview were not custodial in nature -- I'm sorry. We agree with the District Court that the earlier portions were not custodial in nature, but we do not agree with the District Court's conclusion that the entire interview was non-custodial.

After the second break, when Agent Fincher accused Padilla of terrorist activities, a reasonable person would have felt subjected to a degree of restraint comparable to arrest. At this point the interrogation became custodial, and it is evident by his reactions, he stood up, announced the interview was over. Because the interview became custodial in nature, any statements he made after he was accused of participating in terrorist activities and before he received his *Miranda* warning would have been inadmissible.

And so my only question really in all of this -- there's a lot that happened here that probably shouldn't have

1   happened, a lot was perfectly appropriate, but the point at

2   which Officer Villaseñor accused the defendants of being in a

3   high drug traffic area and having dumped -- having found a bale

4   that they tossed, my question is did that constitute a

5   sufficient accusatorial statement to push this over into an

6   interrogation rather than just the Alpha Report inquiry.

7   That's my question.

8           MR. BOGGS:  I answer emphatically no, Your Honor.

9           First of all, the witness, Officer Villaseñor, never

10  did accuse, did not accuse.  This situation -- I'm not familiar

11  with the case that you're talking about, haven't read it, but

12  from your description of it, I heard 10, 15 ways to distinguish

13  this case from that case.  This case is nothing like the case

14  you just told us about.  It seems like apples and oranges to

15  me.

16          The witness did not confront the -- Officer

17  Villaseñor did not confront the detainees, he merely stated why

18  they were boarding.  I can imagine this being a very normal

19  thing, hey, we're boarding your boat because we saw that you

20  have a light out.  We're boarding your boat because you're in a

21  known drug trafficking area and we saw a bale go aboard.  There

22  was no question --

23          THE COURT:  A bale go aboard or a bale being tossed?

24          MR. BOGGS:  A bale being tossed.

25          And, Your Honor, please, please, remember that the

1 witnesses' careers are on the line when they come in this

2 Court, and please, please, Your Honor, please distinguish

3 between insignificant matters and matters of importance.

4    There's a jury instruction that I'm sure Your Honor

5 reads before every trial about how to judge credibility of

6 witnesses and about insignificant details should not lead to an

7 adverse credibility finding, and I'm fearful for my witnesses

8 because they were asked many, many, many insignificant things

9 and it's extremely normal for people to remember things

10 somewhat differently.

11    THE COURT:  That's why I am not, Counsel, fully aware

12 of your concerns, addressing myself to all of the various

13 things that they forgot or misstated or maybe misstated.

14    MR. BOGGS:  I don't think they --

15    THE COURT:  My question is once he did what he admits

16 that he did, which is that he boarded and he told them that

17 they were stopped because they were in a known drug trafficking

18 area and we retrieved a bale that they had tossed, he was

19 suspicious in his head about their criminal behavior and he

20 started to question them, and if we accept him at his word,

21 Varga said they were traffickers.

22    MR. BOGGS:  Why wouldn't we accept him at his word,

23 Your Honor?

24    THE COURT:  I'm saying we will accept him at his

25 word, that that's what he said.

1    My question is:  If that is what he said and that is

2    the answer he elicited, is that sufficient to put the

3    defendants in, first, a position -- I think they're clearly in

4    a position that they knew they couldn't leave, and so that

5    answers the Eleventh Circuit's first concern; but the second

6    one was are they sufficiently being interrogated such that this

7    rises to an arrest.  That's the only question.

8    MR. BOGGS:  And the answer to that is no, and it's

9    very clearly no, as shown in the case law.  There are a couple

10   of cases where the environment was found to be sufficiently

11   coercive to break that general rule that these boarding

12   questions, this right to board is not a custodial

13   interrogation, it does not require *Miranda* warnings, very clear

14   in the law.

15   The places -- the few cases where that's been found

16   to not apply are cases where the persons on board were

17   handcuffed, made to lie down, were subjected to questioning for

18   hours.  None of that is present in this case.  The questions

19   that were directed to the persons on board are the standard

20   questions that are asked in every single one of these cases.

21   You've heard from the witness that he talked to the

22   defendants sitting feet away from them at the front of their

23   boat in a conversational manner, took down the responses to

24   their questions, passed it along up the chain.

25   THE COURT:  So you believe that's what happened and

1   not that he was shouting the questions and then shouting them

2   in English and then shouting the answers in English across the

3   bow of the vessel?

4           MR. BOGGS:  Well, there's no testimony whatsoever

5   that he was shouting the questions to the persons on board.

6           THE COURT:  Not the person on board.  I mean across

7   to Agent -- I mean to Officer Perry.

8           MR. BOGGS:  I will give you, Your Honor, that Officer

9   Perry and Officer Villaseñor --

10          THE COURT:  You don't have to give me anything,

11  Counsel.

12          MR. BOGGS:  Well, Your Honor, I -- I feel like I do,

13  because --

14          THE COURT:  But you don't.  You just have to tell me

15  whether you think that he was shouting the answers across the

16  bow of the vessel and the questions in English to

17  Officer Perry, or do you believe Officer Villaseñor, that he

18  spoke calmly to the defendants, wrote down answers using an

19  ink pad, an ink scratch pad thing, and handed those over to

20  Officer Perry?  Which do you believe happened?

21          MR. BOGGS:  I don't know the answer to that question,

22  but it's not relevant to what's before Your Honor, and I pray

23  that you do not fiend the defendants not credible for an

24  insignificant detail such as that.

25          THE COURT:  The witnesses.

1          MR. BOGGS:  They gave their testimony --

2          THE COURT:  The witnesses not credible.

3          MR. BOGGS:  That the witness is not credible, when

4    you did hear testimony that Officer Villaseñor has done 30 to

5    40 boardings in the last year, Officer Perry does even more

6    boardings.

7          THE COURT:  But for purposes of our discussion here,

8    I do have to make credibility determinations and I do have to

9    know what happened, and if one of the things we have to know is

10   the tenor of the conversation between Officer Villaseñor and

11   the defendants, I think you would have to agree that the tenor

12   of the conversation is very different if he's sitting three

13   feet away and saying, sir, tell me what you guys are doing out

14   here, and that's the conversation he's writing on a piece of

15   paper, rather than him saying "Tell me what you're doing out

16   here" and then translating that into English across the bow of

17   the vessel and then translating the answer and then turning

18   around and asking quietly again the question.  That --

19         MR. BOGGS:  I agree, but there's -- there is no

20   testimony that any witness -- any officer was yelling these

21   questions at the detainees.  Well, they weren't detainees yet.

22   At the persons on board.  There's no testimony to that.

23         THE COURT:  Do you think there's a difference in the

24   tenor of the interrogation if it is conversational, like the

25   conversation we're having, and if it is the type of

1   conversation that's described with the yelling and the
2   screaming across the boat, or do you think they're the very
3   same experience with the officer?
4            MR. BOGGS:  Your Honor, of course it would be a
5   different tenor if the questions were being yelled at the
6   persons on board, but there's no testimony that --
7            THE COURT:  I didn't say he yelled at the persons
8   on board, Counsel.  I said yelled at the officer on the other
9   boat.
10           However he's speaking to the defendants, do you think
11  it matters if he is simultaneously English and Spanish
12  translating at the top of his lung across a boat?
13           MR. BOGGS:  Well, first of all, nobody said at the
14  top of his lung.  You keep mischaracterizing the evidence,
15  which makes it extremely difficult to fairly answer your
16  question, Your Honor.
17           THE COURT:  Well, yelling loud enough to get it
18  six feet across the boat.
19           MR. BOGGS:  I remember testimony from Officer Perry
20  that said she could hear what was happening on the other boat,
21  so --
22           THE COURT:  But she didn't speak Spanish and so she
23  couldn't understand what was happening.
24           MR. BOGGS:  She could tell if someone was yelling.
25  I didn't hear her say that he was yelling answers back to her,

1    and he never said he was yelling answers back to her.

2          THE COURT:  Because he didn't give any answers to

3    her.

4          MR. BOGGS:  Right.  So you're making up the part

5    about yelling answers back to the boat.  It didn't happen.

6          THE COURT:  All right.

7          Anything else?

8          MR. BOGGS:  Yes, Your Honor.  I haven't even gotten

9    started.  All I've been doing is answering your questions.

10         THE COURT:  That's what lawyers typically do.

11         Let me hear from Ms. Sweeney.

12         MR. BOGGS:  May I make my argument at some point?

13         THE COURT:  After Ms. Sweeney makes her argument you

14   can give rebuttal.

15         MS. SWEENEY:  Your Honor, I would take you back to

16   Officer Villaseñor.  He actually said this was not routine.  He

17   said it was different.  Both of these officers talked about

18   what they knew, and they both said they had reasonable

19   suspicion before they even launched that this was drug

20   smuggling.  So they went there doing a criminal -- to do a

21   criminal investigation.

22         This right of visit I think is -- never happened, it

23   was always a criminal investigation, and I think that under

24   either scenario, if we take Officer Villaseñor having a

25   conversation, not all -- not all coerced or custodial

confessions come at yelling, but the fact is he said, yes, this
was a criminal investigation, it was more questions about that,
and the questions about telling them the reasonable suspicion
they already had is not part of the Alpha log.  That's what
makes this different.  That's what makes this different from
the Eleventh Circuit cases that say routine questioning doesn't
mean custodial.  We have a different case.  We don't really
even know -- them jumping over the boat into the boat, guns
drawn, turning off the engine, that's definitely custodial.

         If we -- if we believe Officer Perry, then there had
to be raised voices, I think the Court can infer that, and that
it was rapid and that it was coercive to the people sitting in
that boat, like Mr. Varga.  If you're rapidly -- 30 questions
he said he was asking, translating back and forth.  So I think
under any scenario you can find custodial interrogation because
of what the officers themselves said.  They knew from the
beginning they believed they were drug smugglers and they
treated them as such.  They did not treat them as a way to
determine nationality, and that's exactly what Officer
Villaseñor said, yeah, well, it was criminal and I don't
usually ask these questions.

         So that tells you, regardless of his tenor, he had
switched mode into his law enforcement training and they were
in custody, and the manner that they were in custody could also
be a coerciveness, that even if you don't find a

1 Fifth Amendment violation, you could find that their will was

2 overcome by coerciveness just because of the situation that was

3 out there in the ocean.  They've gone through a rainstorm,

4 they've had guns pulled on them, they're ordered, as

5 Officer Villaseñor said, to the front of the boat, two officers

6 jump over the boat, they're three feet, they turn the engine

7 off.  It's coercive, it's custodial, and Officer Villaseñor

8 told us his intention.

9          THE COURT:  Other than the disclosure by Officer

10 Villaseñor of the fact that the officers believed that the

11 defendants were in a high drug trafficking area and that they

12 had pulled a bale that they had jettisoned from the vessel,

13 what about the inquiry turned it into a custodial one that

14 would be different than the scenario in *United States versus*

15 *Ortega*?

16          MS. SWEENEY:  What turns it into it -- differently

17 is that the Alpha log was supposed to determine nationality

18 only, and they changed it.  They changed it and they told you

19 they changed it to do a criminal investigation.

20          THE COURT:  But the Alpha log, you would agree, asked

21 a question, what is the purpose --

22          MS. SWEENEY:  Purpose of the voyage.

23          THE COURT:  Yes.

24          MS. SWEENEY:  But Officer Villaseñor first told you,

25 all I do is go down the list, 30 questions, and I think Officer

1    Perry said that too. But then he changed and he said, well,

2    I did something different this time, and that's because I

3    thought it was a criminal -- I was treating it as a more

4    criminal investigation. I said to them, you're in a drug

5    smuggling area, you're carrying a bale. That's what makes it

6    different from all the other Eleventh Circuit case law that's

7    out there. They did more. That's what makes it custodial.

8            THE COURT: What does the videotape show?

9            MS. SWEENEY: Your Honor, I would agree with --

10   mostly with what Mr. Boggs said. It doesn't -- it's a few

11   seconds, maybe a minute, maybe two minutes, and you see --

12           THE COURT: Well, I don't understand why people don't

13   believe that time is relevant. A few seconds, maybe a minute,

14   maybe two minutes. How long is the video? A few seconds of

15   video is a blink and it's over. Is it a minute? Is it

16   two minutes? Is it nothing at all?

17           MS. SWEENEY: Your Honor, I'm sorry, I can't be as

18   precise as you would like. It does show arms extended, but it

19   does not, as Mr. Boggs said, show anybody going over into the

20   boat. It just shows people standing in the boat -- in the

21   Coast Guard boat next to the target of interest boat.

22           THE COURT: All right. Anything else?

23           MS. SWEENEY: No, Your Honor. Thank you.

24           THE COURT: Counsel.

25           MR. BOGGS: Yes, Your Honor. I'd like to hit a

1    couple of points that came up during the testimony.

2           I believe the Court was frustrated with the Zulu time

3    issue.  Officer Perry explained that Zulu time is a time at a

4    fixed point and she didn't know exactly where that point was.

5    I don't know off the top of my head, but she did explain that

6    it's done for a good reason, it's so that everybody in the

7    Coast Guard is using the same time and doesn't have to -- they

8    may have to use a conversion chart, but they don't have to

9    start looking at Daylight Savings Times and, you know,

10   Eastern Time versus Pacific Time and those kinds of things.

11   It's done for good reasons, to have a standardization.

12          THE COURT:  I'm not concerned about Zulu time other

13   than I'm just confused why people can't look up in the sky and

14   estimate about what time of day it would have been, but I'm not

15   concerned about the Zulu time.

16          MR. BOGGS:  That's why I tried to focus my questions

17   on daylight versus night.

18          Your Honor --

19          THE COURT:  Do you have a sense of what time it

20   was --

21          MR. BOGGS:  Yes.

22          THE COURT:  -- when they encountered the boat the

23   very first time?

24          MR. BOGGS:  They left in the daytime.  I believe the

25   testimony is pretty consistent on this, they left in the

daytime. The encounter on the boat happened at around dusk, as it's starting to get dark. The later parts of the encounter were in darkness. They were on that boat or next to that boat or on it for four to five hours. That's the testimony.

Your Honor, the case package so many questions were asked about is compiled by many different contributors and components, and I've reviewed it but I would not want to tell the Court I know for certain every single part contained therein without doubt. I didn't write it.

THE COURT: Counsel, do you understand what my question is here and the limit to which I believe the issue of custodial status surrounds?

MR. BOGGS: Your Honor --

THE COURT: It's one point.

MR. BOGGS: I do, and I will cover that.

THE COURT: Okay. Focus on that.

To determine whether a detained person is in custody for Fifth Amendment purposes the Court must also assess whether a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest. That's different than this free to leave inquiry, which is pretty well-established.

This requires consideration of the totality of the circumstances, including whether the officers brandished weapons, touched the suspect or used language or a tone that

1  indicated that compliance with the officers would be --
2  I'm sorry, could be compelled, as well as the location and
3  length of detention.
4          It's just that test that I'm here to consider right
5  now.
6          MR. BOGGS:  All right.  Your Honor, I'll focus, I'll
7  zero in just on that, even though there are other things I want
8  to address, but this single question about the purpose of the
9  voyage happened in the very early part of this encounter.
10 Testimony would put it inside, let's said, 20 minutes of the
11 boats coming alongside of each other.  It's one of the first
12 things that happened.  You heard testimony from the witnesses
13 that at no time did the persons on board show any anxiety, they
14 were allowed to go to the bathroom, they were seated, the
15 questions were asked of them in a conversational manner.
16         THE COURT:  What do you make of them being down,
17 I think was the description, in response to the questioning of
18 Officer Villaseñor?
19         MR. BOGGS:  Could you repeat that, Your Honor?
20         THE COURT:  He said that their demeanor was that they
21 were down.
22         MR. BOGGS:  Yeah, they were -- I think they were --
23 what he meant by that was they were depressed, they knew they
24 had been caught, but these are the standard questions that are
25 asked of every person on board a detained boat, and they're --

1  they're needed for a non-law en -- well, yeah, a

2  non-prosecutorial purpose, which is these questions, including

3  the purpose of voyage question, need to be communicated back to

4  the countries, in this case Dominican Republic, to do that

5  registration inquiry and get an answer back, to then take it up

6  to the next level, which is law enforcement boarding.

7         These questions must be asked and are asked in every

8  case on the right of visit boarding, that is not a

9  law enforcement boarding, and you heard how long it took and

10  how everything that the Coast Guard does is done through the

11  chain of command and with authorization.  The only thing that

12  was not covered in a full chain of command relay was the

13  jumping on the boat to hit the kill switch, which was described

14  by both Officer Perry and -- Officer Raven Perry and Officer

15  Villaseñor.

16         If you look at the cases, the boat cases are a little

17  bit different than just the four step inquiry in the Eleventh

18  Circuit, even though that's used in the boat cases as well.

19  They're a little different because people are out on a boat and

20  you can't leave when you're being boarded by the Coast Guard.

21  I can't leave when I'm being boarded by the Coast Guard to do a

22  license and registration check.

23         What the Court is focused on is a degree of

24  coerciveness that's just not at all, in any way, shape or form,

25  present in this case, and the suggestion that Officer

Villaseñor's statement, not a question, statement, letting the
persons on board know that they were in a known
drug trafficking area and that the Coast Guard had seen a bale
go overboard does not transform this case in any -- any
meaningful way from what you can see in the case law. It does
not change anything that he announced why he was on the boat.
He only asked Alpha Log questions.

THE COURT: He didn't say -- he expressly said he
didn't do that, Mr. Boggs.

You said, "What were you doing out here?" And he
said, "Smuggling."

And then Officer Villaseñor said: Yes, ma'am.

And I said: Was that before or after you told him
all this information about finding them in a drug area and so
forth?

And he said: After.

And I said: Those statements aren't on the Alpha
Report, about what you had observed about the vessel and such.
Where did that come from?

That was on our brief, Your Honor.

From your brief from the boat, back before you got on
the small boat?

Yes, Your Honor.

So you gathered the three guys at the top of the
boat, and then you say, hey, guys, I'm on this boat and let me

1    tell you what we know about what's going on here.

2              And he said:  Yes, Your Honor.

3              And then what do you tell them?

4              I need them to answer these questions I have in this

5    report.

6              No, but what did you tell them about what they were

7    doing?

8              I just told them that they were in a suspected drug

9    trafficking area and then we recovered a bale.

10             And then I asked a question that you objected to, and

11   he said "No, I didn't say that, Your Honor," and I say:  Why

12   are you talking about the briefing to these people in

13   connection with this first boarding, the right of visit?  Why

14   are you talking about the whole drug smuggling venture in

15   connection with the right of visit Alpha Report requirement?

16             His answer:  I don't know.  I don't know, Your Honor.

17             Isn't that more the law enforcement part?

18             Yes, Your Honor.

19             And are those standard questions you ask of all boats

20   you have boarded for the purpose of doing the right of visit?

21             Are these the questions I ask?

22             No, this whole business about telling them you're in

23   a high drug smuggling area.

24             Then you object again.

25             Why did you say anything in that scenario?

1        I don't know, Your Honor.

2        And then we went on to something else.

3        And so he's saying this is not his normal procedure,

4   to ask this -- to do this preface, and your --

5        MR. BOGGS:  It was -- that's very important.  It

6   wasn't a question, it was a statement, Your Honor.  And I would

7   just -- I would ask you to step back and put yourself in the

8   shoes of somebody boarding a boat.  Just mentioning, hey, this

9   is why we're boarding your boat, very natural thing to do.

10  There's no rule that I'm aware of in the Coast Guard that they

11  cannot announce why they're boarding a boat.  As I said,

12  you know, they might say:  Listen, you've got a light out.

13  Lesson, your flag is on crooked.  Listen, you know, you're in

14  a -- the reason we're boarding your boat is this.

15       THE COURT:  Or you're Al-Qaeda terrorists, let me ask

16  you a few questions.

17       MR. BOGGS:  Well, the record is quite clear that

18  Officer Villaseñor did not ask any questions that weren't on

19  the Alpha Report, that weren't the standard questions that need

20  to be transmitted to the Dominican Republic in this case.  And

21  a dual purpose is -- is present in all of these cases.  Yes,

22  they are trying to stop drug smuggling, but they follow proper

23  procedure that has been found under the case law to be a

24  procedure that does not require Mirandizing the defendants, and

25  in this case the simple announcement, not accusation, not

1  question, the simple announcement by Officer Villaseñor that,

2  hey, you're in a known drug trafficking area and we saw a bale

3  go overboard, a bale of not identified what, does not convert

4  this into a case where the defendant, Bernardo Varga's

5  statement that they were smuggling should be suppressed.

6          THE COURT:  All right.  Anything else, Ms. Sweeney?

7          MS. SWEENEY:  No, Your Honor, but -- one thing.

8  We've heard testimony from two officers that there were ion

9  scans done.  There's not a single thing in the case package

10 that there were ion scans done, so I'd ask the Court to order

11 the Government to produce those -- that report or whatever

12 relates to ion scans within a week.

13         MR. BOGGS:  Your Honor, that's something that I would

14 be happy to take care of with Ms. Sweeney.

15         THE COURT:  Well, are there ion scans?

16         MR. BOGGS:  It was a surprise to me.

17         THE COURT:  Are there ion scans?

18         MR. BOGGS:  I don't know the answer to the question.

19 I would tend to believe -- but this is not a promise about what

20 happened.  Both witnesses said that there were ion scans.

21 I would tend to think somehow it didn't make it into the case

22 report.  We will get to the bottom of it, I promise you, and we

23 will communicate that.

24         THE COURT:  All right.  The Court orders the

25 Government to get to the bottom of it within a week and produce

1  it to the defense or produce to the defense that both of the

2  witnesses were confused and there was no ion scan done.

3          MR. BOGGS:  Thank you, Your Honor.

4          THE COURT:  And I assume there's been no effort at a

5  resolution of this case through any sort of plea agreement

6  while this motion has been pending; is that right?

7          MS. SWEENEY:  That's correct, Your Honor.  The only

8  plea that's always ever been offered is the standard boat plea.

9          THE COURT:  All right.  And can one of you produce

10 the video to the Court by tomorrow morning, please.

11         MR. BOGGS:  Tomorrow morning may be a bit of a

12 challenge because I'm going to have to have it rendered onto a

13 compact disc and I know that there's nobody at Automated --

14         THE COURT:  Well, how did Officer Perry look at it?

15 She said she looked at it today.

16         MR. BOGGS:  On a computer screen.

17         THE COURT:  I mean, under what --

18         MR. BOGGS:  We can -- like the defense, we can bring

19 things right down from the cloud and look at them.

20         THE COURT:  So by what time tomorrow?

21         MR. BOGGS:  I have to do it -- I will do it as

22 quickly as possible.  I have to do a ticket with the Automated

23 Litigation Support staff.

24         THE COURT:  By noon tomorrow.  Anything else?

25         MS. SWEENEY:  No, Your Honor.  Thank you.

1          THE COURT:  Thank you.  We're dismissed.

2                         - - - - -

3              (Proceedings concluded at 5:16 p.m.)

4                         - - - - -

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3          This is to certify that the foregoing transcript of

4    proceedings taken in a motion hearing in the United States

5    District Court is a true and accurate transcript of the

6    proceedings taken by me in machine shorthand and transcribed by

7    computer under my supervision, this the 27th day of August,

8    2021.

9

10

11                                    /S/ DAVID J. COLLIER

12

13                                    DAVID J. COLLIER

14                                    OFFICIAL COURT REPORTER

15

16

17

18

19

20

21

22

23

24

25